IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

QUANTUM TECHNOLOGY PARTNERS                08-CV-376-BR
II, L.P., a Delaware limited
partnership,                               OPINION AND ORDER

        Plaintiff,

v.

ALTMAN BROWNING AND COMPANY,
an Oregon corporation; BAKER
GROUP LLP; KAY E. ALTMAN, an
individual; MICHAEL J. BAKER,
an individual; DAVID M.
BROWNING, an individual; and
DOES 1 through 20,

        Defendants,

and

APEX DRIVE LABORATORIES,
INC., a Delaware corporation,

        Nominal Defendant.

**JOHN S. STEWART**
**ROBERT B. COLEMAN**
**TYLER J. STORTI**
Stewart Sokol & Gray, LLC
2300 S.W. First Avenue
Suite 200
Portland, OR 97201
(503) 221-0699

       Attorneys for Plaintiff

**DAVID W. AXELROD**
**DEVON ZASTROW NEWMAN**
Schwabe Williamson & Wyatt, PC
1600-1900 Pacwest Center
1211 S.W. Fifth Avenue
Portland, OR 97204
(503) 222-9981

       Attorneys for Defendants Altman Browning and Company,
       Kay E. Altman, and David M. Browning

**GARY I. GRENLEY**
**PAUL H. TRINCHERO**
**DAVID E. DEAN**
Grenley Rotenberg Evans Bragg & Bodie PC
1211 S.W. Fifth Avenue
Suite 1100
Portland, OR 97204
(503) 241-0570

       Attorneys for Defendants Baker Group LLP and Michael J.
       Baker

**DANIEL P. LARSEN**
**JAMES M. BARRETT**
Ater Wynne, LLP
222 S.W. Columbia
Suite 1800
Portland, OR 97201
(503) 226-1191

       Attorneys for Nominal Defendant Apex Drive
       Laboratories, Inc.

**BROWN, Judge.**

This matter comes before the Court on the Motion to Dismiss (#14) of Nominal Defendant Apex Drive Laboratories, Inc.; the Motion to Strike (#13) of Defendants Baker Group LLP and Michael J. Baker; the Motion to Strike (#18) of Defendants Altman Browning and Company, Kay E. Altman, and David M. Browning; the Motion to Dismiss (#13) of Defendants Baker Group LLP and Michael J. Baker; and the Motion to Dismiss (#18) of Defendants Altman Browning and Company, Kay E. Altman, and David M. Browning.

For the reasons that follow, the Court **GRANTS** the Motion to Dismiss of Nominal Defendant Apex; **GRANTS in part** and **DENIES in part** the Motion to Strike of Defendants Baker Group LLP and Baker; **GRANTS in part** and **DENIES in part** the Motion to Strike of Defendants Altman Browning and Company, Altman, and Browning; **GRANTS** the Motion to Dismiss of Defendants Baker Group LLP and Baker; and **GRANTS** the Motion to Dismiss of Defendants Altman Browning and Company, Altman, and Browning.

## BACKGROUND

The following facts are taken from the First Amended Complaint and Defendants' Memoranda in support of their Motions to Dismiss.

At some point before 2004, Plaintiff Quantum Technology Partners II, L.P., purchased shares in Primotive Corporation for

3 - OPINION AND ORDER

$590,000.[1]  On February 25, 2004, Primotive's Board of Directors (BOD) and a majority of its shareholders voted to sell substantially all of Primotive's assets to Apex.  In exchange for Primotive's assets, Apex issued 51% of its stock to the former shareholders of Primotive.  Through this transaction, Quantum became an Apex shareholder.

Also on February 25, 2004, Apex entered into a Services Agreement with Altman Browning and Company (ABCO) in which they agreed ABCO would develop Primotive's technology.  Pursuant to the Services Agreement, Apex issued the remaining 49% of its outstanding stock to Baker Group.  Baker Group then assigned 8.9% of those shares to Laughlin LLC "in exchange for the services ABCO agreed to perform for Apex."[2]  Under the terms of the Services Agreement, ABCO was required to accomplish specifically enumerated "milestones" by January 1, 2006, on which date the Services Agreement terminated.  If ABCO did not accomplish the milestones, the Apex shares transferred to Baker Group were subject to repurchase by Apex.

Baker, Altman, and Browning signed the Services Agreement on behalf of Apex in their capacities as Apex's President and Chief Executive Officer (CEO), Chief Financial Officer (CFO), and Chief

---

[1] At the time Quantum purchased its shares, Primotive was named Motile Corporation.

[2] Laughlin LLC is not identified or further described in the First Amended Complaint.

4 - OPINION AND ORDER

Technical Officer (CTO) respectively.  Baker, Altman, and Browning also signed the agreement on behalf of ABCO acting in their capacities as ABCO's President and CEO, CFO, and CTO respectively.

In September 2004, Apex billed Holjeron Company $50,000 for a prototype project completed for Holjeron.  Apex then paid the $50,000 to ABCO pursuant to the Services Agreement.

ABCO did not accomplish all of the milestones set out in the Services Agreement before January 1, 2006.  Because ABCO did not accomplish all of the required milestones, Quantum delivered to the Baker Group and Laughlin a written consent of the majority of "non-interested shareholders" and payments required to repurchase their shares of Apex.

At an Apex shareholder meeting on February 16, 2006, Quantum moved to affirm the repurchase of the shares of Baker Group and Laughlin, and "[t]he motion carried based upon a count of shares owned by a majority of the disinterested stockholders."  Also at that meeting, Quantum noted the Services Agreement had expired by its own terms on January 1, 2006.  Baker, however, asserted the directors of Apex (*i.e.*, Baker, Altman, and Browning) had extended the Services Agreement at a BOD meeting in December 2005.  In its First Amended Complaint, Quantum asserts the December 2005 BOD meeting never occurred and the document that Baker, Altman, and Browning provided to Quantum to establish that

5 - OPINION AND ORDER

the BOD meeting occurred was "created after-the-fact."

In December 2006, Porteon Electric Vehicles, Inc., made a "substantial investment" in Apex, and it became Apex's largest shareholder.  On January 25, 2007, Brad Hippert, President of Porteon, was elected to Apex's BOD.

On February 15, 2007, Quantum filed a complaint in Multnomah County Circuit Court in which it brought claims for fraudulent inducement, breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment against the same Defendants in this action based on the same facts underlying this action.  On May 23, 2007, Quantum voluntarily dismissed the Multnomah County action without prejudice.

On June 5, 2007, Quantum submitted to Apex a Demand for Investigation by Independent Directors of Apex Corporation in which Quantum demanded an investigation as to whether ABCO met the milestones of the Services Agreement; whether the Services Agreement deadline had been validly extended; when the notes of the December 2005 BOD meeting were created; whether the actions taken at the February 16, 2006, stockholder meeting were "valid"; whether Apex received $50,000 from Holjeron and paid those funds to ABCO; and whether Defendants committed fraud, were self-dealing, breached their fiduciary duties, abused their control of Apex, grossly mismanaged Apex, wasted the corporate assets of

Apex, violated Delaware corporate law, illegally converted the assets of Apex, and/or misrepresented ABCO's experience and skill to carry out the Services Agreement.

On July 10, 2007, Porteon's CEO Ken Montler and CFO James Boehlke met with Barry Dickman, Quantum's owner and manager, to discuss the possibility of Porteon purchasing Quantum's shares of Apex.  After the meeting, Dickman sent Boehlke an email in which he rejected Porteon's suggestion, noted the settlement offer with respect to the Multnomah County action before Quantum voluntarily dismissed that case, anticipated extensive legal fees if Quantum were to renew its action against Defendants, predicted discovery in such an action to be "monumental," and noted Dickman did not "see how Apex survives past about October" due to the costs of such an action and the fact that no one would invest in Apex under a cloud of litigation.

On September 6, 2007, the BOD formed a Special Investigative Committee (SIC) to investigate Quantum's June 5, 2007, Demand for Investigation.

On January 15, 2008, Hippert issued a report to Apex's shareholders in which he reviewed Quantum's June 2007 Demand. Hippert noted Apex's SIC hired independent outside counsel to investigate Quantum's Demand for Investigation and noted the SIC concluded pursuant to the investigation that "Quantum's claims have a tenuous foundation based on the facts."  Hippert conceded

7 - OPINION AND ORDER

Apex's BOD "could have kept better records of its deliberations and "may have stretched the boundaries of its authority in some of its decisions." Hippert concluded, however, although the BOD "may have made decisions that affected its own interests, the ultimate outcome of its management of [Apex] during the time in question was fair to [Apex]." Finally, Hippert noted "the diversion of resources to pursue litigation rather than advancing the core business of Apex would surely cripple [Apex] and inhibit the progress we are making." Hippert concluded, therefore, Apex should not take further action on Quantum's Demand for Investigation.

On January 23, 2008, Dickman emailed the independent outside counsel to express his dissatisfaction with the investigation and to question outside counsel's objectivity. Outside counsel forwarded Dickman's email to Hippert, expressed his discomfort with responding directly to Dickman, and reiterated the "scope and design" of the investigation "were free from outside influence." Specifically, "Browning, Altman and Baker played no role in limiting or expanding the investigation, and neither did anyone else."

On March 25, 2008, Quantum filed a Complaint in this Court against Defendants in which it brought derivative claims for (1) breach of fiduciary duty; (2) abuse of control; (3) gross mismanagement; (4) waste of corporate assets; (5) specific

performance; and (6) unjust enrichment and direct claims for
(a) conspiracy to violate the Racketeering Influenced and Corrupt
Organizations Act (RICO), 18 U.S.C. §§ 1961, *et seq.*,
(b) violation of RICO, 18 U.S.C. § 1962(a), (b), and (c), and
(c) fraudulent inducement.

On May 8, 2008, Quantum filed its First Amended Complaint to
include more factual allegations to support its RICO claims.

On May 9, 2008, Defendants filed Motions to Dismiss this
action.

On September 17, 2008, the Court issued an Order in which it
advised the parties it would provide them with a "Draft Opinion
and Order."  The Court also permitted the parties to file
supplemental briefs by September 26, 2008, to ensure the parties
had an adequate opportunity to make their record as to the issues
raised in Defendants' Motions.

On September 26, 2008, Plaintiff filed a supplemental brief
in opposition in Defendants' Motions.  Defendants declined to
file supplemental materials.

## STANDARDS

Dismissal under Federal Rule of Civil Procedure 12(b)(6) for
failure to state a claim is proper only if the pleadings fail to
allege enough facts so as to demonstrate a plausible entitlement
to relief.  *Bell Atlantic v. Twombly*, ___ U.S. ___, 127 S. Ct.

1955, 1964-65 (2007).

> While a complaint attacked by a Rule 12(b)(6)
> motion to dismiss does not need detailed factual
> allegations, a plaintiff's obligation to provide
> the "grounds" of his "entitle[ment] to relief"
> requires more than labels and conclusions, and a
> formulaic recitation of the elements of a cause of
> action will not do.  Factual allegations must be
> enough to raise a right to relief above the
> speculative level on the assumption that all the
> allegations in the complaint are true (even if
> doubtful in fact).

*Id.* at 1964-65.  The court accepts as true the allegations in the complaint and construes them in favor of the plaintiff. *Intri-Plex Tech., Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1050 n.2 (9th Cir. 2007).  "The court need not accept as true, however, allegations that contradict facts that may be judicially noticed by the court, and may consider documents that are referred to in the complaint whose authenticity no party questions."  *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000)(citations omitted).

Federal Rule of Civil Procedure 8(a) generally provides a pleading that sets forth a claim must contain "a short and plain statement of the claim showing the pleader is entitled to relief."  The plaintiff need only provide in the initial pleading sufficient factual allegations to give the defendant "fair notice" of the claims against it and the grounds on which the claim is based.  *Conley*, 355 U.S. at 47.

Federal Rule of Civil Procedure 9(b), however, requires all

10 - OPINION AND ORDER

allegations of fraud to be stated "with particularity."  The
heightened pleading standard of Rule 9(b) also applies to RICO
claims that include allegations of fraudulent activities as
predicate acts of racketeering.  *Odom v. Microsoft Corp.*, 486
F.3d 541, 553 (9th Cir. 2007).

To satisfy the additional burdens imposed by Rule 9(b), the
plaintiff must allege "the time, place and nature of the alleged
fraudulent activities."  *Fecht v. Price Co.*, 70 F.3d 1078, 1082
(9th Cir. 1995)(quotation omitted).  In addition, Rule 9(b)

> does not allow a complaint to merely lump multiple
> defendants together but require[s] plaintiffs to
> differentiate their allegations when suing more
> than one defendant . . . and inform each defendant
> separately of the allegations surrounding his
> alleged participation in the fraud.

*Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007)
(quotation omitted).  "In the context of a fraud suit involving
multiple defendants, a plaintiff must, at a minimum, 'identif[y]
the role of [each] defendant[ ] in the alleged fraudulent
scheme.'"  *Id.* at 765 (quoting *Moore v. Kayport Package Express,
Inc.*, 885 F.2d 531, 541 (9th Cir. 1989)).

In addition, Federal Rule of Civil Procedure 23.1, which
governs actions in which "one or more shareholders or members of
a corporation or an unincorporated association bring a derivative
action to enforce a right that the corporation or association may
properly assert but has failed to enforce," requires the
plaintiff who asserts a derivative claim to verify his complaint

11 - OPINION AND ORDER

and to

> (1) allege that the plaintiff was a shareholder
> or member at the time of the transaction
> complained of, or that the plaintiff's share
> or membership later devolved on it by
> operation of law;
>
> (2) allege that the action is not a collusive one
> to confer jurisdiction that the court would
> otherwise lack; and
>
> (3) state with particularity:
>
>> (A) any effort by the plaintiff to obtain
>> the desired action from the directors or
>> comparable authority and, if necessary,
>> from the shareholders or members; and
>>
>> (B) the reasons for not obtaining the action
>> or not making the effort.

To determine whether a complaint meets the pleading standards of Rule 23.1, the court must look to the law of the state of the company's incorporation. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 989-90 (9th Cir. 1999).

If a claim is dismissed pursuant to Rule 12(b)(6), Rule 9(b), or Rule 23.1, the could should grant the plaintiff leave to amend his complaint unless the court determines the allegation of other facts consistent with the operative pleading could not possibly cure the deficiency. *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). *See also Reddy v. Litton Indus.*, 912 F.2d 291 (9th Cir. 1990), *cert. denied*, 502 U.S. 921 (1991); *In re Openwave Sys., Inc. Shareholder Derivative Litig.*, 503 F. Supp. 2d 1341, 1351 (N.D.

Cal. 2007)(dismissed complaint for failure to meet the
requirements of Rule 23.1 with leave to amend complaint).

## MOTION TO DISMISS OF NOMINAL DEFENDANT APEX DRIVE LABORATORIES, INC. (#14)

Apex moves to dismiss Quantum's derivative claims (*i.e.*,
Quantum's claims for breach of fiduciary duty, abuse of control,
gross mismanagement, waste of corporate assets, specific
performance, and unjust enrichment) on the grounds that
(1) Quantum does not fairly and adequately represent the
interests of Apex's other similarly situated shareholders,
(2) Quantum fails to plead with particularity as required under
Rule 23.1 that its Demand for Investigation was wrongfully
refused by the Apex BOD, and (3) the derivative claims are
unverified as required under Rule 23.1.

**I.    Fair and adequate representation of the interests of Apex's shareholders.**

Apex contends Quantum does not fairly and adequately
represent the interests of Apex's other similarly situated
stockholders because (1) Quantum's conduct has been vindictive
toward other Apex shareholders; (2) Quantum seeks to rescind its
acceptance of Apex's shares, which conflicts with its interests
as a shareholder; and (3) Quantum's interest in its direct claims
far exceed and conflict with its interest in its derivative
claims.

13 - OPINION AND ORDER

**A.    Standards.**

Derivative actions are brought by a shareholder to enforce a corporation's rights when the corporation itself fails to enforce its rights.  *See Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 528-34 (1984).  As noted, derivative actions are subject to the procedural requirements of Rule 23.1, which provides a derivative action "may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association maintained."

As noted, to determine whether Quantum's First Amended Complaint meets the pleading standards of Rule 23.1, the Court must look to the law of the state of the company's incorporation. *Silicon Graphics*, 183 F.3d at 989-90.  Apex is incorporated in Delaware, and, therefore, the Court must apply Delaware law.

Under Delaware law, "Rule 23.1 has been interpreted as requiring that a court consider any extrinsic factors which might indicate that a representative might disregard the interests of the other members of the class." *Emerald Partners v. Berlin*, 564 A.2d 670, 673 (Del. Ch. 1989)(citing *Davis v. Comed., Inc.*, 619 F.2d 588 (6th Cir. 1980), and *Blum v. Morgan Guar. Trust Co. of New York*, 539 F.2d 1388 (5th Cir. 1976)).  For purposes of Defendants' Motions to Dismiss as to the issue of Quantum's

adequacy as a shareholder representative, the Court, therefore,

may consider matters outside of the complaint.

> "Among the elements which the courts have
> evaluated in considering whether the derivative
> plaintiff meets Rule 23.1's representation
> requirements are, economic antagonisms between
> representative and class; the remedy sought by the
> plaintiff in the derivative action; indications
> that the named plaintiff was not the driving force
> behind the litigation; plaintiff's unfamiliarity
> with the litigation; other litigation pending
> between the plaintiff and defendants; the relative
> magnitude of plaintiff's personal interests as
> compared to his interest in the derivative action
> itself; plaintiff's vindictiveness toward the
> defendants and, finally, the degree of support
> plaintiff was receiving from the shareholders he
> purported to represent."

                          * * *

> "Typically, the elements are intertwined or
> interrelated, and it is frequently a combination
> of factors which leads a court to conclude that
> the plaintiff does not fulfill the requirements of
> 23.1 (although often a strong showing of one way
> in which the plaintiff's interests are actually
> inimical to those he is supposed to represent
> fairly and adequately, will suffice in reaching
> such a conclusion)."

*Id*. (quoting *Davis*, 619 F.2d at 593-95). "The determination of

whether a derivative plaintiff will adequately represent the

interests of the other class members, therefore, involves a

multidimensional examination, although a strong showing of one

factor, depending upon the circumstances, may be sufficient in

itself to disqualify a plaintiff who desires to represent a

class." *Id*. at 673-74.

        A shareholder may maintain a derivative action even

15 - OPINION AND ORDER

though "it does not have the support of a majority of the
corporation's shareholders or even the support of all the
minority stockholders." *Id*. at 674 (citing *Nolen v. Shaw-Walker
Co.*, 449 F.2d 506, 508, n.4 (6th Cir. 1971)).  "The true measure
of adequacy of representation, therefore, is not how many
shareholders the derivative plaintiff represents, but rather, how
well he advances the interests of the other similarly situated
shareholders." *Id*. (citing *Schupack v. Covelli*, 512 F. Supp.
1310 (W.D. Pa. 1981), and *Halstead Video, Inc. v. Guttillo*, 115
F.R.D. 177 (N.D. Ill. 1987)).

        Courts will not disqualify a plaintiff in a derivative
action "simply because he may have interests which go beyond the
interests of the class and, as long as the plaintiff's interests
are coextensive with the class, his representation of the class
will not be proscribed." *Id*. (citing *Recchion, Westinghouse
Elec. Corp. v. Kirby*, 637 F. Supp. 1309 (W.D. Pa. 1986)).  In
addition, "purely hypothetical, potential or remote conflicts of
interest will not disqualify a derivative plaintiff." *Id*.
(citing *Youngman v. Tahmoush*, 457 A.2d 376 (Del. Ch. 1983), and
*Vanderbilt v. Geo-Energy Ltd.*, 725 F.2d 204 (3d Cir. 1983)).

> A defendant has the burden of proof in a motion to
> disqualify a derivative plaintiff and he must show
> that a serious conflict exists, by virtue of one
> factor or a combination of factors, and that the
> plaintiff cannot be expected to act in the
> interests of the others because doing so would
> harm his other interests. . . .  In effect, the
> defendant must show a substantial likelihood that

>       the derivative action is not being maintained for
>       the benefit of the shareholders.

*Id.*

**B. Analysis.**

Apex contends Quantum's personal interests greatly

outweigh its interest in the derivative action: *i.e.*, Quantum

seeks to recover at least its initial Primotive investment of

$595,000, but only seeks to recover the $50,000 paid to ABCO on

behalf of Apex through its derivative claim.  Apex also contends

Quantum has not received any support from the shareholders it

purports to represent, and, in fact, Quantum has acted

vindictively toward Apex's other shareholders.  Finally, Apex

contends Quantum seeks to rescind its acceptance of Apex's shares

as a remedy for its direct claim even though Quantum would then

no longer be an Apex shareholder, and, according to Apex, would,

therefore, lack standing to bring a derivative action.

The Court questions whether Apex's assertion with

respect to Quantum's standing is correct.  Rule 23.1(b) requires

only that the complaint "allege . . . the plaintiff was a

shareholder or member at the time of the transaction complained

of."  In its First Amended Complaint, Quantum alleges it was a

shareholder in Apex at the time of the events in question.  These

allegations satisfy Rule 23.1.

With respect to vindictiveness, the Delaware court

noted in *Emerald Partners* that

17 - OPINION AND ORDER

> [i]nadequacy as a class representative is not made
> out merely because of a disconcordant relation
> between plaintiff and defendants.  To the
> contrary, this may inspire plaintiff to be an even
> more forceful advocate.  That plaintiff may have
> amorphous hostile feelings against defendants is
> not in itself relevant to the court given the
> absence of any concrete fact which reveals a
> conflict of interest between plaintiff and the
> class sufficient to make his representation
> inadequate.

564 A.2d 676 (quotation omitted).  Here Apex points to the fact

that Quantum threatened on July 10, 2007, to litigate the matters

at issue here, to subject Apex through litigation to the high

cost of "monumental" discovery, and to place Apex "under a cloud

of litigation" that would cause investors not to invest in Apex

to the extent that Quantum acknowledged it did not "see how Apex

survive[d] past October."  These facts establish Quantum had more

than "amorphous hostile feelings" against Apex's other

shareholders and reveal a concrete conflict of interest between

Quantum and Defendants.  In addition, the record does not reflect

any other Apex shareholder supports Quantum's efforts to rescind

Apex's stock transfer or to obtain any of the other relief sought

by Quantum.

Based on this record, the Court finds Apex has

established that Quantum will individually profit from this

litigation to the detriment of other similarly situated Apex

shareholders as well as to the detriment of Apex and that the

interests of Quantum diverge from those of Apex and its

shareholders.  The Court, therefore, concludes Apex has established Quantum does not fairly and adequately represent the interests of Apex's other similarly situated shareholders.

Accordingly, the Court grants Apex's Motion to Dismiss Quantum's derivative claims for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, specific performance, and unjust enrichment.

## II.  Refusal of Quantum's Demand for Investigation.

Even if the Court concluded Quantum would fairly and adequately represent the interests of Apex's other similarly situated shareholders, the Court would have to grant Apex's Motion to Dismiss on the ground that Quantum has not alleged wrongful refusal of its Demand for Investigation with particularity.

Rule 23.1 requires a complaint in a shareholder-derivative action to

(3) state with particularity:

(A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and

(B) the reasons for not obtaining the action or not making the effort.

The demand requirement of Rule 23.1 is based on the basic premise that "directors, rather than shareholders, manage the business and affairs of the corporation." *Spiegel v. Buntrock*, 571 A.2d

19 - OPINION AND ORDER

767, 772-73 (Del. Supr. 1990).  "The decision to bring a law suit
or to refrain from litigating a claim on behalf of a corporation
is a decision concerning the management of the corporation.
Consequently, such decisions are part of the responsibility of
the board of directors."  *Id*. at 773 (citation omitted).
Derivative actions are "[i]n essence, . . . a challenge to a
board of directors' managerial power."  *Id*. (citation omitted).

> Thus, by its very nature, "the derivative action
> impinges on the managerial freedom of directors."
> *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. Supr.
> 1984).  In fact, the United States Supreme Court
> has noted that the shareholder derivative action
> "could, if unrestrained, undermine the basic
> principle of corporate governance that the
> decisions of a corporation-including the decision
> to initiate litigation-should be made by the board
> of directors or the majority of shareholders."
> *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 531
> (1984)(citing *Hawes v. Oakland,* 104 U.S. 450
> (1882)).  *See Kaplan v. Peat, Marwick, Mitchell &
> Co.*, 540 A.2d 726, 730 (Del Supr. 1988).
>
> "Because the shareholders' ability to
> institute an action on behalf of the corporation
> inherently impinges upon the directors' power to
> manage the affairs of the corporation the law
> imposes certain prerequisites on a stockholder's
> right to sue derivatively." *Kaplan v. Peat,
> Marwick, Mitchell & Co.*, 540 A.2d at 730 (citing
> *Pogostin v. Rice*, 480 A.2d at 624); *Aronson v.
> Lewis*, 473 A.2d at 811. . . .  Rule 23.1 requires
> that shareholders seeking to assert a claim on
> behalf of the corporation must first exhaust
> intracorporate remedies by making a demand on the
> directors to obtain the action desired, or to
> plead with particularity why demand is excused.
> *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d
> at 730.  *See also Aronson v. Lewis*, 473 A.2d at
> 811-812; *Zapata Corp. v. Maldonado*, 430 A.2d at
> 783.

> The purpose of pre-suit demand is to assure that the stockholder affords the corporation the opportunity to address an alleged wrong without litigation, to decide whether to invest the resources of the corporation in litigation, and to control any litigation which does occur. *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d at 730. "[B]y promoting this form of alternate dispute resolution, rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations." *Aronson v. Lewis*, 473 A.2d at 812.

*Id.*

With respect to the level of particularity required for a demand under Rule 23.1, the Court, as noted, must apply Delaware law. *Silicon Graphics*, 183 F.3d at 989-90. Under Delaware law, when a court analyzes whether a demand complies with the requirements of Rule 23.1, the

> court limits its consideration to the particularized facts alleged in the complaint; the burden is thus more onerous than that required to withstand an ordinary motion to dismiss. . . . "Conclusory allegations of fact or law [which are] not supported by allegations of specific fact may not be taken as true."

*Belova v. Sharp*, No. CV 07-299-MO, 2008 WL 700961, at *3 (D. Or. March 13, 2008)(citing *Aronson v. Lewis*, 473 A.2d 805, 813-15 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 796 A.2d 244 (Del. 2000), and quoting *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991)).

In its First Amended Complaint, Quantum alleges:

> Plaintiff did not make a demand on the Apex Board to institute this action, because such a

21 - OPINION AND ORDER

demand would have been futile, wasteful, and a
useless act. . . .  In the alternative, on or
about June 5, 2007, plaintiff demanded that the
board take the action(s) demanded in this
Complaint.  The Apex Board agreed to investigate,
as demanded. . . .  The Apex Board's investigation
was inadequate.

* * *

None of the directors are disinterested,
because they each face a substantial likelihood of
liability for their breaches of fiduciary duty to
Apex.  The Board's decisions were not products of
valid business judgment and the transactions were

not fair and reasonable to the Company.  Thus,
demand was futile as to each of the directors.

First Am. Compl. ¶¶ 42-43.

With respect to Quantum's allegation that it made a demand

for investigation but the investigation was inadequate or, in the

alternative, that Quantum did not make a demand for investigation

because such demand would have been futile, Delaware courts have

held a derivative plaintiff cannot allege futility after it has

made such a demand.  In *Spiegel*, the Delaware Supreme Court

rejected the plaintiff's argument that "demand should be

encouraged by permitting a demand to be made, while at the same

time permitting the argument, that demand was excused, to be

preserved."  571 A.2d at 774-75.  The court concluded under

Delaware law that "[b]y making a demand, a stockholder tacitly

acknowledges the absence of facts to support a finding of

futility.  Thus, when a demand is made, the question of whether

demand was excused is moot."  *Id*. at 775.  "A shareholder who

22 - OPINION AND ORDER

makes a demand can no longer argue that demand is excused." *Id*.

Here Quantum alleges it "demanded that [Apex's BOD] take the action(s) demanded in this Complaint." Because Quantum asserted it made a Demand for Investigation to Apex's BOD, Quantum must state with particularity "the reasons for not obtaining the action [sought]" pursuant to Rule 23.1. In other words, Quantum must allege with particularity that Apex wrongfully refused Quantum's demand. *See Grimes v. DSC Commc'n Corp.*, 724 A.2d 561, 565 (Del. Ch. 1998)("A stockholder wishing to pursue a derivative action after a board of directors has refused a pre-suit demand must allege with particularity facts sufficient to create a reasonable doubt that the corporation's board wrongfully refused the demand.").

Quantum does not specifically allege in its First Amended Complaint that its demand was wrongfully refused. Instead Quantum alleges the investigation was inadequate, the BOD is "not disinterested," the BOD's decisions are not the products of valid business judgment, and the transactions were not fair and reasonable for the company. The Court concludes these allegations are merely generalized conclusory statements and do not satisfy the specificity requirements of Rule 23.1.

Accordingly, the Court grants Apex's Motion to Dismiss Quantum's claims for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, specific

performance, and unjust enrichment on the additional ground that Quantum has not satisfied the demand requirements of Rule 23.1 to plead with particularity "the reasons for not obtaining the action or not making the effort."

**MOTION TO STRIKE OF DEFENDANTS ABCO, ALTMAN, AND BROWNING (#18) and MOTION TO STRIKE OF DEFENDANTS BAKER GROUP, LLP, AND MICHAEL J. BAKER (#13)**

ABCO, Altman, Browning, Baker, and Baker Group move to strike a portion of paragraph 16 and all of paragraph 19 of Quantum's First Amended Complaint.

**I.    Portion of Paragraph 16.**

Defendants move to strike the portion of paragraph 16 in which Quantum alleges the Individual Defendants "reasonably should have known." Defendants contend this phrase sets out the incorrect level of scienter required to support a claim for fraudulent inducement.

The Court, however, does not look to the complaint for its legal standards. The Court will apply the appropriate legal standard regardless of Quantum's allegations in its First Amended Complaint.

Accordingly, the Court denies Defendants' Motions to Strike as to the phrase "reasonably should have known" from paragraph 16 of Quantum's First Amended Complaint.

II.  **Paragraph 19**.

Defendants move to strike paragraph 19 of Quantum's First

Amended Complaint in its entirety.

In paragraph 19, Quantum alleges:

> At the time of the transaction, Plaintiff Quantum
> asked the attorney for Apex, who was acting in the
> course and scope of his agency for Apex, whether
> the Individual Defendants, as a result of their
> being the sole directors of Apex, would be
> precluded from voting to renew, extend or modify
> the services agreement if ABCO did not meet the
> specified milestones.  The attorney told Plaintiff
> Quantum that under Delaware corporate law, they
> could not vote to renew, extend or modify the
> services agreement because they had a conflict of
> interest and were not disinterested directors.
> This attorney had special knowledge, skill and
> experience in Delaware corporate law, which
> Plaintiff Quantum lacked.  As a result, Plaintiff
> Quantum was entitled to rely, and in fact did
> reasonably and justifiably rely on this
> representation.  This representation was a
> material misrepresentation of fact and law, which
> Plaintiff Quantum relied upon to its detriment in
> voting to proceed with the transaction.

Defendants contend the Court should strike this paragraph

because Quantum cannot attribute the alleged statement of

Apex's counsel to any defendant other than Apex, and Quantum

cannot assert a direct claim against Apex for misrepresen-

tation or fraud at the same time that it asserts a

derivative claim on behalf of Apex.

Quantum, in turn, contends it alleges the facts in

paragraph 19 as background rather than as the basis for any

claim.  As Defendants note, however, the last two sentences

of paragraph 19 suggest Quantum bases the element of
reliance in its fraudulent-inducement claim on the state-
ments allegedly made by Apex's counsel.  Thus, according to
Defendants, these allegations go beyond background facts.

Because Quantum is asserting derivative claims on
behalf of Apex, and, therefore, Quantum cannot assert a
direct claim against Apex for misrepresentation or fraud,
the Court grants Defendants' Motions to Strike as to the
last two sentences of paragraph 19 of the First Amended
Complaint.


**MOTION TO DISMISS OF DEFENDANTS ABCO, ALTMAN, AND
BROWNING (#18) and MOTION TO DISMISS OF DEFENDANTS
BAKER GROUP, LLP, AND MICHAEL J. BAKER (#13)**[3]

Quantum brings nine claims against ABCO, Altman, Browning,
Baker, and Baker Group:  six in its capacity as a derivative
plaintiff (breach of fiduciary duty, abuse of control, gross
mismanagement, waste of corporate assets, specific performance,
and unjust enrichment) and three direct claims (conspiracy to
violate RICO, violations of RICO, and fraudulent inducement).

ABCO, Altman, and Browning move to dismiss all of Quantum's
claims on the ground that Quantum does not fairly and adequately
represent Apex's other shareholders in its derivative claims.

---

[3] Defendants Baker Group and Michael J. Baker filed a
separate Motion to Dismiss in which they merely join the Motion
to Dismiss of Defendants ABCO, Altman, and Browning.

Here all Defendants (with the exception of Apex) move to dismiss Quantum's direct claims on the grounds that (1) Quantum failed to plead sufficient predicate acts to state a RICO claim; (2) Quantum did not plead its RICO claims with sufficient particularity; (3) Quantum has not plead fraudulent inducement with sufficient particularity; and (4) Quantum's claims for abuse of control, gross mismanagement, and waste of corporate assets do not state a claim separate from Quantum's claim for breach of fiduciary duty.

**I.    Derivative Claims.**

For the reasons noted above, the Court concludes Quantum does not fairly and adequately represent the interest of Apex's other shareholders.  Accordingly, the Court grants the Motions to Dismiss of ABCO, Altman, Browning, Baker, and Baker Group as to Quantum's derivative claims for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, specific performance, and unjust enrichment.

**II.   Portions of Quantum's RICO claims are preempted by the Private Securities Litigation Reform Act (PSLRA).**

Quantum brings claims against Defendants other than Apex for violation of and conspiracy to violate §§ 1962(a), (b), and (c) of RICO.  "To state a RICO claim [under § 1962(a), (b), or (c)], one must allege a pattern of racketeering activity, which requires at least two predicate acts." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1116 (9th Cir. 2008)(citations omitted).

27 – OPINION AND ORDER

Section 107 of the PSLRA amended RICO to prohibit the use of securities fraud as a predicate act. *Swartz*, 476 F.3d at 761. After enactment of the PSLRA, RICO provides in pertinent part that

> [a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor . . . except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

18 U.S.C. § 1964(c).

Congress enacted the PSLRA to "deprive plaintiffs of the right to bring securities fraud based RICO claims," *Scott v. Boos*, 215 F.3d 940, 945 (9th Cir. 2000), and to "prevent a plaintiff from 'plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud .'" *Sell v. Zions First Nation Bank,* No. CV 05 0684 PHX SRB, 2006 WL 322469, at *8 (D. Ariz. Feb. 9, 2006) (quoting *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 324 (3d Cir. 1999)). *See also Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 372 (S.D.N.Y. 2004)("In amending RICO, Congress was clear in stating that the PSLRA was meant to eliminate the possibility that litigants might frame their securities claims under a mail or wire fraud claim."); *Swartz v. KPMG, LLC*, 401 F. Supp. 2d 1146, 1151 (W.D. Wash. 2004)

28 - OPINION AND ORDER

("The rule that a plaintiff cannot assert a RICO claim based on predicate acts that sound in securities fraud is applicable even if, as is the case here, the claim is pled as a matter of mail fraud or wire fraud.")(citing *Howard v. Am. Online, Inc.*, 208 F.3d 741, 749-50 (9th Cir. 2000)).

Here Defendants contend the conduct Quantum relies on as the basis for its RICO claims is conduct actionable as securities fraud, and, therefore, it may not form the basis for predicate acts under RICO.  According to Defendants, therefore, Quantum has not adequately pled his RICO claims.

When determining whether conduct alleged in the context of a RICO claim is "conduct . . . actionable as fraud in the purchase or sale of securities," courts have looked to the Securities Exchange Act of 1983, 15 U.S.C. § 78j(b), which makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  Rule 10b-5 implements this provision and forbids the use "in connection with the purchase or sale of any security" of "any device, scheme, or artifice to defraud" or any other "act, practice, or course of business" that "operates . . . as a fraud or deceit."  17 C.F.R. § 240.10b-5.

In *S.E.C. v. Zanford*, the Supreme Court explained these

29 - OPINION AND ORDER

provisions "should be construed not technically and restric-
tively, but flexibly to effectuate [the Act's] remedial
purposes."  535 U.S. 813, 820 (2002).  In *Zanford*, the defendant,
a securities broker, persuaded William Wood to open an investment
account and to give the defendant a general power of attorney to
engage in securities transactions for Wood's benefit without
prior approval.  *Id*. at 815.  Several years later, an audit
revealed the defendant had transferred money from Wood's account
to accounts controlled by the defendant on over 25 occasions.
*Id*.  The defendant was indicted on 13 counts of wire fraud based
on allegations that the defendant sold securities in Wood's
account and made personal use of the proceeds.  *Id*. at 815-16.
The Securities and Exchange Commission (SEC) then brought a civil
complaint against the defendant in which it alleged the defendant
violated § 10(b) of the Securities Exchange Act when he engaged
in a scheme to defraud Wood and misappropriated Wood's
securities.  *Id*. at 816.  The Supreme Court accepted *certiorari*
to determine whether the defendant's alleged fraudulent conduct
occurred "in connection with the purchase or sale of any
security" within the meaning of § 10(b) and Rule 10b-5.  The
defendant asserted he had not committed fraud "in connection
with" the sale of securities because the "sales themselves were
perfectly lawful" and were not "in connection with" the
misappropriation of the proceeds from those sales.  *Id* at 820.

30 - OPINION AND ORDER

The Court rejected the defendant's argument and reasoned:

> [T]he securities sales and the respondent's
> fraudulent practices were not independent events.
> This is not a case in which, after a lawful
> transaction had been consummated, a broker decided
> to steal the proceeds and did so.  Nor is it a
> case in which a thief simply invested the proceeds
> of a routine conversion in the stock market.
> Rather, the respondent's fraud coincided with the
> sales themselves. . . .  [E]ach sale was made to
> further respondent's fraudulent scheme. . . .  In
> the aggregate, the sales are properly viewed as a
> course of business that operated as a fraud or
> deceit on a stockbroker's customer.

*Id*. at 820-21.  The Court noted the "in connection with"
requirement for securities fraud was "extremely broad" and only
proof of "a fraudulent scheme in which the securities
transactions and breaches of fiduciary duty coincide" is
necessary to satisfy that requirement.  *Id*. at 825.

In paragraphs 75-76 of its First Amended Complaint, Quantum
alleges the following facts in support of its RICO claims:

> Under 18 U.S.C. § 1962(a), Defendants
> unlawfully received income derived, directly and
> indirectly, from a pattern of racketeering
> activity and used and invested, directly and
> indirectly, all or part of such income (and/or
> proceeds therefrom) in acquisition of interests in
> and the establishment and operation of an
> enterprise engaged in, and the activities of which
> affect, interstate or foreign commerce.  Under 18
> U.S.C. § 1962(b), Defendants also, through a
> pattern of racketeering activity acquired and
> maintained, directly and indirectly, interest in
> and control of an enterprise that engaged in, and
> the activities of which affect, interstate or
> foreign commerce.  Under 18 U.S.C. § 1962(c),
> Defendants, particularly the Individual Defendants
> and DOES, were employed by and associated with an
> enterprise engaged in, or the activities of which

31 - OPINION AND ORDER

affect, interstate or foreign commerce, to conduct
and participate, directly and indirectly, in the
conduct of such enterprise's affairs through a
pattern of racketeering activity.

* * *

The pattern of racketeering activity in which
Defendants engaged included a pattern of conduct
in violation of 18 U.S.C. §§ 1341 (relating to
mail fraud) and 1343 (relating to wire fraud), in
that Defendants, having devised or intending to
devise their scheme or artifice to defraud
Plaintiff and obtain money and property by means
of false and fraudulent pretenses, representations
and promises, and for the purpose of executing
such scheme or artifice (or attempting to do so),
upon information and belief placed matters and
things in the mail (and/or private or commercial
interstate carrier) and, upon information and
belief, transmitted or caused to be transmitted by
means of wire, radio, or television communication
in interstate or foreign commerce, various
writings, signals, pictures or sounds for the
purpose of executing such scheme or artifice.
Such schemes or artifices involved the following
pattern of activity, the details of which are more
fully described above:

a.    Fraudulently proposing, establishing and
inducing Plaintiff into becoming involved with the
transaction(s) among and between Primotive, Apex,
ABCO, Baker Group and Laughlin, LLC;

b.    Fraudulently submitting invoices to Apex
and otherwise billing Apex (and crediting ABCO)
for work allegedly performed by ABCO when, in
fact, little (if any) useful work was actually
done, no progress was made, waste and inefficiency
were rewarded, no results were forthcoming and
invoices and bills were otherwise fraudulently
falsified;

c.    Fraudulently representing that the
services agreement had been approved by a
legitimately authorized vote of the Apex board,
falsifying after-the-fact Apex board minutes
allegedly reflecting that extension, and otherwise

wrongfully acting without proper authority and
with conflicts of interest to extend the services
agreement; and

d.    Fraudulently causing money to be paid to
and credit to be taken by ABCO purportedly under
the services agreement for the work billed by Apex
to Holjeron and the false representations and
communications connected therewith.

As noted, Congress bars a plaintiff from asserting claims under
RICO that involve securities fraud to "prevent a plaintiff from
pleading other specified offenses, such as mail fraud or wire
fraud, as predicate acts under RICO if such offenses are based on
conduct that would have been actionable as securities fraud."
*Bald Eagle*, 189 F.3d at 327.  In addition, the PSLRA prohibits
any person from "us[ing] or employ[ing], . . . any . . .
deceptive device or contrivance" in connection with the purchase
or sale of any security.

Here Defendants note the transaction referenced in paragraph
76(a) is the one in which Quantum acquired Apex shares.
According to Defendants, even though Quantum couches its RICO
claims as based on mail and wire fraud, the predicate acts
specifically alleged in paragraph 76(a) to support these claims
occur in connection with the sale of securities, and the alleged
mail and wire fraud at issue coincides with the transfer of
securities.  Defendants contend, therefore, that Quantum is
barred from relying on the conduct alleged in paragraph 76(a) to
establish a RICO claim.  The Court agrees.

33 - OPINION AND ORDER

Accordingly, the Court concludes the PSLRA and RICO bar
Quantum from relying on the allegations in paragraph 76(a) of the
First Amended Complaint as a predicate act to support his RICO
claims.

**III. Quantum lacks standing to bring derivative RICO claims.**

Defendants assert the predicate acts alleged by Quantum in
paragraphs 76(b)-(d) of its First Amended Complaint are
derivative in nature, and, therefore, Quantum cannot base its
RICO claims on these allegations.

"In order to state a claim for a RICO violation, a plaintiff
must plead facts that show the defendant's violation of § 1962
was the proximate cause of the plaintiff's injury." *Altamont
Summit Apartments, LLC v. Wolff Prop., LLC*, No. Civ. 01-1260-BR,
2002 WL 926264, at *13 (D. Or. Feb. 13, 2002)(citing *Hamid v.
Price Waterhouse*, 51 F.3d 1411, 1419 (9th Cir. 1995), *cert.
denied*, 516 U.S. 1047 (1996)).  "A plaintiff may not sue directly
if his injury is derived wholly from an injury to a third party."
*Id.* (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258,
268-69 (1992)).

> Thus, shareholders may not sue for the harm to the
> class of shareholders as a whole unless the
> plaintiffs can show either:  (1) an injury
> distinct from that of the other shareholders or
> (2) a special duty owed by the defendant to the
> plaintiffs that is different from the duties owed
> by the defendant to the corporate entity.

*Id.* (citing *Sparling v. Hoffman Constr. Co., Inc.*, 864 F.2d 635,

640 (9th Cir. 1988)).  *See also Hamid*, 51 F.3d at 1419-20 (As to
shareholders asserting a RICO claim when "the harm is to all the
members, and the injuries claimed by the plaintiffs are not
separate and distinct from those to shareholders . . . generally,
the RICO claim is derivative and there is no standing on the part
of the shareholders . . . to assert it.").  A shareholder
"generally" only sustains injury because he is a shareholder of
the corporation, and his injury "is derivative of the injury of
the corporation and is not caused[, therefore,] by the RICO
violations." *Hamid*, 51 F.3d at 1420 (citation omitted).
"Permitting [shareholders] to bring individual actions for such
injuries would invariably impair the rights of other
[shareholders]." *Id*. (quotation omitted).

Here in paragraphs 76(b)-(d), Quantum asserts Defendants
fraudulently overbilled Apex for ABCO's services, fraudulently
caused Apex to pay to ABCO the $50,000 Apex received from
Holjeron, and fraudulently represented the Apex BOD had extended
the Services Agreement.  Although Quantum does not specifically
identify the damages it suffered as a result of Defendants'
alleged RICO violations, Quantum states in paragraph 33 of the
First Amended Complaint:

> As a result of the defendants' improprieties, Apex
> has expended significant sums, which include, but
> are not limited to, credits to ABCO for work under
> the services agreement, when ABCO has utterly
> failed to perform and payment of $50,000 to ABCO
> for work purportedly done "under" the service

> agreement for services billed to Holjeron, and
> cancellation of the Company's repurchase rights,
> which resulted in dilution of shareholder equity.

These described damages as well as the facts supporting them were allegedly suffered by Apex directly. Thus, any damages Quantum sustained as a result of the acts alleged in paragraphs 76(b)-(d) were solely derivative in nature. As in *Sparling*, the "wrong alleged [here] is a fraud on the corporation," and Quantum has not alleged any injury distinct from the injury suffered by other shareholders as a result of the acts set out in paragraphs 76(b)-(d). Quantum also does not allege any special duty that Defendants, officers, and shareholders of Apex owed to Quantum that differed from the duties that Defendants owed to Apex. The Court, therefore, concludes Quantum does not have standing to assert RICO claims based on the allegations in paragraphs 76(b)-(d) of the First Amended Complaint.

In summary, the Court concludes Quantum's allegations in paragraph 76(a) of the First Amended Complaint do not support Quantum's RICO claims because such allegations are not predicate acts that support a claim under the PSLRA and/or RICO. The Court also concludes Quantum does not have standing to assert a RICO claim based on the allegations in paragraphs 76(b)-(d) of the First Amended Complaint.

Accordingly, the Court grants Defendants' Motions to Dismiss

as to Quantum's RICO claims.[4]

### III. Quantum has not pled its claim for fraudulent inducement with sufficient particularity.

As noted, Federal Rule of Civil Procedure 9(b) requires all allegations of fraud to be stated "with particularity."  In order to satisfy the additional burdens imposed by Rule 9(b), the plaintiff must allege "the time, place and nature of the alleged fraudulent activities."  *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995)(quotation omitted).  In addition, Rule 9(b)

> does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.

*Swartz*, 476 F.3d at 764-65 (quotation omitted).  "In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, 'identif[y] the role of [each] defendant[ ] in the alleged fraudulent scheme.'"  *Id.* at 765 (quoting *Moore*, 885 F.2d at 541).

In its fraudulent-inducement claim, Quantum alleges in pertinent part that "Defendants made material misrepresentations of fact, or omitted to state material facts, with the intent to

----

[4] Because the Court concludes Quantum has not adequately pled facts sufficient to support its RICO claims, the Court need not decide whether Quantum pled its RICO claims with the specificity required by Rule 9(b).  The Court notes, however, if it were to address that issue, it is likely the Court would conclude Quantum has not satisfied the requirements of Rule 9(b).

37 - OPINION AND ORDER

induce Quantum to enter into the transaction."  Quantum
incorporates by reference paragraphs 1-43 of the First Amended
Complaint to support its claim.  Even if Rule 9(b) required
Defendants to sift through 43 paragraphs of the First Amended
Complaint in an effort to identify the allegations that support
Quantum's fraudulent-inducement claim, the First Amended
Complaint fails to provide the level of specificity required by
Rule 9(b).  For example, Quantum alleges in paragraph 16 that
"ABCO and the Individual Defendants, shortly before Quantum voted
its shares in Primotive to approve the transaction, represented
to Quantum that ABCO had the personnel, experience and skill
necessary to perform the services required by the services
agreement. . . .  [T]his representation was false."  Quantum does
not identify the date or place of the representation or the
Defendant who made the representation with sufficient
specificity.  In addition, Quantum does not plead any facts to
show that Defendants knew the representation was false at the
time it was made in contrast to the possibility that Defendants
may have honestly misjudged ABCO's ability to perform or that
some other circumstance prohibited performance.  *See Yourish v.*
*Cal. Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999)(the plaintiff
must "set forth, as part of the circumstances constituting fraud,
an explanation as to why the disputed statement was untrue or
misleading when made.  This falsity requirement can be satisfied

38 - OPINION AND ORDER

by pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants."  Quotations omitted.)).

The Court concludes Quantum has not pled its claim for fraudulent inducement with the level of particularity required by Rule 9(b).  Accordingly, the Court grants Defendants' Motions to Dismiss as to Quantum's fraudulent-inducement claim.

**IV.  Quantum's Third, Fourth, and Fifth Claims.**

Defendants move to dismiss Quantum's Third, Fourth, and Fifth Claims for abuse of control, gross mismanagement, and waste of corporate assets respectively on the ground that these claims are subsumed within Quantum's Second Claim for breach of fiduciary duty.  Because the Court has concluded Quantum does not fairly and adequately represent the interest of Apex's shareholders with respect to Quantum's derivative claims, the Court need not address Defendants' argument as to whether Quantum's Third, Fourth, and Fifth Claims are subsumed in Quantum's Second Claim.

**V.   Leave to amend.**

As noted, when the court dismisses a claim pursuant to Rule 12(b)(6), Rule 9(b), or Rule 23.1, leave to amend should be granted unless the court determines the allegation of other facts consistent with the operative pleading could not possibly cure the deficiency.  *Schreiber Distrib. Co. v. Serv-Well Furniture*

39 - OPINION AND ORDER

*Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). *See also Reddy v. Litton Indus.*, 912 F.2d 291 (9th Cir. 1990), *cert. denied*, 502 U.S. 921 (1991); *In re Openwave Sys. Inc. Shareholder Derivative Litig.*, 503 F. Supp. 2d 1341, 1351 (N.D. Cal. 2007)(dismissed complaint for failure to meet the requirements of Rule 23.1 with leave to amend complaint).

**A.    Quantum's derivative claims.**

The Court has concluded Quantum does not fairly and adequately represent the interests of Apex's other shareholders. In its supplemental brief, Quantum asserts if it were allowed to file a Second Amended Complaint, it would assert facts that show other shareholders support Quantum's efforts to rescind Apex's stock transfer and to include more specific allegations about the inadequacy of the investigation by the SIC.

Based on these assertions, the Court grants Quantum leave to amend its First Amended Complaint to cure the deficiencies with respect to Quantum's derivative claims noted by Plaintiff in its supplemental materials.

**B.    Quantum's RICO claims.**

In *Swartz*, the Ninth Circuit upheld the district court's dismissal of the plaintiff's RICO claim with prejudice and without leave to amend. 476 F.3d at 761. The Ninth Circuit noted the district court concluded the plaintiff's RICO claim was based on predicate acts that were "in connection with" the sale

of stock and, therefore, "could not form the basis of a RICO claim under section 107 of the [PSLRA]." *Id*.  The Ninth Circuit agreed with the district court's conclusion and noted in response to the plaintiff's request to amend its complaint that because "the PSLRA bar would apply under any internally consistent set of facts, it would be futile to amend the RICO claim.  Consequently, it was not error to dismiss this claim with prejudice."  *Id*.

The facts here are similar to those in *Swartz* in that any internally consistent set of facts that Quantum could plead to support its RICO claim would either be barred by the PSLRA or by *Sparling* because Quantum's injury is derivative of the alleged injury to Apex.  In addition, Quantum did not assert it could cure these deficiencies in its supplemental briefing.

Accordingly, the Court declines to allow Quantum to amend its First Amended Complaint as to its RICO claims on the ground that it would be futile.

**C.    Quantum's claim for fraudulent inducement.**

The Court dismisses Quantum's claim for fraudulent inducement for failure to plead fraud with the requisite particularity.

Accordingly, the Court grants Quantum leave to amend its First Amended Complaint to cure the deficiencies noted with respect to Quantum's fraudulent-inducement claim.

**CONCLUSION**

For these reasons, the Court **GRANTS** the Motion to Dismiss (#14) of Nominal Defendant Apex; **GRANTS in part** and **DENIES in part** the Motion to Strike (#13) of Defendants Baker Group LLP and Baker; **GRANTS in part** and **DENIES in part** the Motion to Strike (#18) of Defendants Altman Browning and Company, Altman, and Browning; **GRANTS** the Motion to Dismiss (#13) of Defendants Baker Group LLP and Baker; and **GRANTS** the Motion to Dismiss (#18) of Defendants Altman Browning and Company, Altman, and Browning.

The Court also **GRANTS** Quantum leave to amend its First Amended Complaint no later than November 1, 2008, for the purpose of curing the deficiencies noted in this Opinion and Order as to Quantum's derivative claims and its fraudulent-inducement claim.

IT IS SO ORDERED.

DATED this 2nd day of October, 2008.


/s/ Anna J. Brown

_____

ANNA J. BROWN
United States District Judge


42 - OPINION AND ORDER