IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


QUANTUM TECHNOLOGY PARTNERS                08-CV-376-BR
II, L.P., a Delaware limited
partnership,                               OPINION AND ORDER

          Plaintiff,

v.

ALTMAN BROWNING AND COMPANY,
an Oregon corporation; BAKER
GROUP LLP; KAY E. ALTMAN, an
individual; MICHAEL J. BAKER,
an individual; DAVID M.
BROWNING, an individual; and
DOES 1 through 20,

          Defendants,

and

APEX DRIVE LABORATORIES,
INC., a Delaware corporation,

          Nominal Defendant.

**JOHN S. STEWART**
**ROBERT B. COLEMAN**
**TYLER J. STORTI**
Stewart Sokol & Gray, LLC
2300 S.W. First Avenue
Suite 200
Portland, OR 97201
(503) 221-0699

       Attorneys for Plaintiff

**DAVID W. AXELROD**
**DEVON ZASTROW NEWMAN**
Schwabe Williamson & Wyatt, PC
1600-1900 Pacwest Center
1211 S.W. Fifth Avenue
Portland, OR 97204
(503) 222-9981

       Attorneys for Defendants Altman Browning and Company,
       Kay E. Altman, and David M. Browning

**GARY I. GRENLEY**
**PAUL H. TRINCHERO**
**DAVID E. DEAN**
Grenley Rotenberg Evans Bragg & Bodie PC
1211 S.W. Fifth Avenue
Suite 1100
Portland, OR 97204
(503) 241-0570

       Attorneys for Defendants Baker Group LLP and Michael J.
       Baker

**DANIEL P. LARSEN**
**JAMES M. BARRETT**
Ater Wynne, LLP
222 S.W. Columbia
Suite 1800
Portland, OR 97201
(503) 226-1191

       Attorneys for Nominal Defendant Apex Drive
       Laboratories, Inc.

2 - OPINION AND ORDER

**BROWN, Judge.**

This matter comes before the Court on the Motion (#37) to Dismiss filed by Nominal Defendant Apex Drive Laboratories, Inc.; the Motion (#39) to Dismiss or in the Alternative for Summary Judgment filed by Defendants Baker Group LLP and Michael J. Baker; the Motion (#44) to Dismiss or in the Alternative for Summary Judgment of Defendants Altman Browning and Company (ABCO), Kay E. Altman, and David M. Browning; and the Motion (#58) for Leave to File (Third) Amended Complaint filed by Plaintiff Quantum Technology Partners II, L.P.

For the reasons that follow, the Court **GRANTS** Defendants' Motions to Dismiss and **DENIES in part** and **GRANTS in part** Quantum's Motion to File (Third) Amended Complaint to the extent that Quantum has leave to file no later than **July 7, 2009**, a Third Amended Complaint limited to a putative claim for breach of contract as set out by Quantum in its Motion for Leave to File (Third) Amended Complaint.  The Court also grants Defendants leave to file any dispositive motions as to Quantum's Third Amended Complaint no later than to Dismiss by **July 28, 2009**.

<u>**STANDARDS**</u>

Dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is proper only if the pleadings fail to allege enough facts to demonstrate a plausible entitlement to

3 - OPINION AND ORDER

relief.  *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007).

> While a complaint attacked by a Rule 12(b)(6)
> motion to dismiss does not need detailed factual
> allegations, a plaintiff's obligation to provide
> the "grounds" of his "entitle[ment] to relief"
> requires more than labels and conclusions, and a
> formulaic recitation of the elements of a cause of
> action will not do.  Factual allegations must be
> enough to raise a right to relief above the
> speculative level on the assumption that all the
> allegations in the complaint are true (even if
> doubtful in fact).

*Id.*  The court accepts as true the allegations in the complaint
and construes them in favor of the plaintiff.  *Intri-Plex Tech.,
Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1050 n.2 (9th Cir.
2007).  "The court need not accept as true, however, allegations
that contradict facts that may be judicially noticed by the
court, and may consider documents that are referred to in the
complaint whose authenticity no party questions."  *Shwarz v.
United States*, 234 F.3d 428, 435 (9th Cir. 2000)(citations
omitted).

Federal Rule of Civil Procedure 8(a) generally provides a
pleading that sets forth a claim must contain "a short and plain
statement of the claim showing the pleader is entitled to
relief."  The plaintiff need only provide in the initial pleading
sufficient factual allegations to give the defendant "fair
notice" of the claims against it and the grounds on which the
claim is based.  *Conley*, 355 U.S. at 47.

Federal Rule of Civil Procedure 9(b), however, requires all

allegations of fraud to be stated "with particularity."

To satisfy the additional burdens imposed by Rule 9(b), the plaintiff must allege "the time, place and nature of the alleged fraudulent activities." *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995)(quotation omitted).  In addition, Rule 9(b)

> does not allow a complaint to merely lump multiple
> defendants together but require[s] plaintiffs to
> differentiate their allegations when suing more
> than one defendant . . . and inform each defendant
> separately of the allegations surrounding his
> alleged participation in the fraud.

*Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007) (quotation omitted).  "In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, 'identif[y] the role of [each] defendant[ ] in the alleged fraudulent scheme.'"  *Id*. at 765 (quoting *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir. 1989)).

In addition, Federal Rule of Civil Procedure 23.1, which governs actions in which "one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce," requires the plaintiff who asserts a derivative claim to verify his complaint and to

> (1) allege that the plaintiff was a shareholder
> or member at the time of the transaction
> complained of, or that the plaintiff's share
> or membership later devolved on it by
> operation of law;

5 - OPINION AND ORDER

(2) allege that the action is not a collusive one
to confer jurisdiction that the court would
otherwise lack; and

(3) state with particularity:

(A) any effort by the plaintiff to obtain
the desired action from the directors or
comparable authority and, if necessary,
from the shareholders or members; and

(B) the reasons for not obtaining the action
or not making the effort.

To determine whether a complaint meets the pleading standards of
Rule 23.1, the court must look to the law of the state of the
company's incorporation. *In re Silicon Graphics Inc. Sec.
Litig.*, 183 F.3d 970, 989-90 (9th Cir. 1999). Apex is
incorporated in Delaware, and, therefore, the Court applies
Delaware law.

Under Delaware law, "Rule 23.1 has been interpreted as
requiring that a court consider any extrinsic factors which might
indicate that a representative might disregard the interests of
the other members of the class." *Emerald Partners v. Berlin*, 564
A.2d 670, 673 (Del. Ch. 1989)(citing *Davis v. Comed., Inc.*, 619
F.2d 588 (6th Cir. 1980), and *Blum v. Morgan Guar. Trust Co. of
New York*, 539 F.2d 1388 (5th Cir. 1976)). For purposes of Apex's
Motion to Dismiss for Quantum's inadequacy as a shareholder
representative, the Court, therefore, may consider matters
outside of the complaint.

"Among the elements which the courts have
evaluated in considering whether the derivative

plaintiff meets Rule 23.1's representation
requirements are, economic antagonisms between
representative and class; the remedy sought by the
plaintiff in the derivative action; indications
that the named plaintiff was not the driving force
behind the litigation; plaintiff's unfamiliarity
with the litigation; other litigation pending
between the plaintiff and defendants; the relative
magnitude of plaintiff's personal interests as
compared to his interest in the derivative action
itself; plaintiff's vindictiveness toward the
defendants and, finally, the degree of support
plaintiff was receiving from the shareholders he
purported to represent."

* * *

"Typically, the elements are intertwined or
interrelated, and it is frequently a combination
of factors which leads a court to conclude that
the plaintiff does not fulfill the requirements of
23.1 (although often a strong showing of one way
in which the plaintiff's interests are actually
inimical to those he is supposed to represent
fairly and adequately, will suffice in reaching
such a conclusion)."

*Id.* (quoting *Davis*, 619 F.2d at 593-95).  "The determination of

whether a derivative plaintiff will adequately represent the

interests of the other class members, therefore, involves a

multidimensional examination, although a strong showing of one

factor, depending upon the circumstances, may be sufficient in

itself to disqualify a plaintiff who desires to represent a

class."  *Id.* at 673-74.

If a claim is dismissed pursuant to Rule 12(b)(6), Rule

9(b), or Rule 23.1, the court should grant the plaintiff leave to

amend his complaint unless the court determines the allegation of

other facts consistent with the operative pleading could not

possibly cure the deficiency. *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). *See also Reddy v. Litton Indus.*, 912 F.2d 291 (9th Cir. 1990); *In re Openwave Sys., Inc. Shareholder Derivative Litig.*, 503 F. Supp. 2d 1341, 1351 (N.D. Cal. 2007)(dismissed complaint for failure to meet the requirements of Rule 23.1 with leave to amend complaint).


## BACKGROUND

Because the Court decides the parties' issues in the context of Defendants' Motions to Dismiss and does not reach Defendants' alternative Motion for Summary Judgment, the Court takes the following facts from the Second Amended Complaint as well as the extrinsic evidence the parties submitted on the issue of Quantum's adequacy as a shareholder representative. In so doing, the Court accepts as true the allegations in the Second Amended Complaint and construes them in favor of Quantum.

At some point before 2004, Quantum purchased shares in Primotive Corporation for $590,000. At the time Quantum purchased its shares, Primotive was named Motile Corporation.

On February 25, 2004, Primotive's Board of Directors (BOD) and a majority of its shareholders voted to sell substantially all of Primotive's assets to Apex. In exchange for Primotive's assets, Apex issued 51% of its stock to the former shareholders

of Primotive.  Through this transaction, Quantum became an Apex
shareholder.

Also on February 25, 2004, Apex entered into a Services
Agreement with ABCO in which they agreed ABCO would develop
Primotive's technology.  Pursuant to the Services Agreement, Apex
issued the remaining 49% of its outstanding stock to Baker Group.
Baker Group then assigned 8.9% of those shares to Laughlin LLC,
which is not identified or further described in the Second
Amended Complaint, "in exchange for the services ABCO agreed to
perform for Apex."  Under the terms of the Services Agreement,
ABCO was required to accomplish specifically enumerated
"milestones" by January 1, 2006, on which date the Services
Agreement terminated.  If ABCO did not accomplish the milestones,
the Apex shares transferred to Baker Group were subject to
repurchase by Apex.

Baker, Altman, and Browning signed the Services Agreement on
behalf of Apex in their capacities as Apex's President and Chief
Executive Officer (CEO), Chief Financial Officer (CFO), and Chief
Technical Officer (CTO) respectively.  Baker, Altman, and
Browning also signed the Services Agreement on behalf of ABCO
acting in their capacities as ABCO's President and CEO, CFO, and
CTO respectively.

In September 2004, Apex billed Holjeron Company $50,000 for
a prototype project completed for Holjeron.  Apex then paid the

9 - OPINION AND ORDER

$50,000 to ABCO pursuant to the Services Agreement.

ABCO did not accomplish all of the milestones set out in the Services Agreement before January 1, 2006. As a result, Quantum delivered to the Baker Group and Laughlin a written consent of the majority of "non-interested shareholders" and payments required to repurchase their shares of Apex.

At an Apex shareholder meeting on February 16, 2006, Quantum moved to affirm the repurchase of the shares of Baker Group and Laughlin, and "[t]he motion carried based upon a count of shares owned by a majority of the disinterested stockholders." Also at that meeting, Quantum noted the Services Agreement had expired by its own terms on January 1, 2006. Baker, however, asserted the directors of Apex (*i.e.*, Baker, Altman, and Browning) previously had extended the Services Agreement at a BOD meeting in December 2005.

In December 2006, Porteon Electric Vehicles, Inc., made a "substantial investment" in Apex and became Apex's largest shareholder. On January 25, 2007, Brad Hippert, President of Porteon, was elected to Apex's BOD.

On February 15, 2007, Quantum filed a complaint in Multnomah County Circuit Court in which it brought claims for fraudulent inducement, breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment against the same Defendants in this action

based on the same facts underlying this action.  On May 23, 2007, Quantum voluntarily dismissed the Multnomah County action without prejudice.

On June 5, 2007, Quantum submitted to Apex a Demand for Investigation by Independent Directors of Apex Corporation in which Quantum demanded an investigation as to whether ABCO met the milestones of the Services Agreement; whether the Services Agreement deadline had been validly extended; when the notes of the December 2005 BOD meeting were created; whether the actions taken at the February 16, 2006, stockholder meeting were "valid"; whether Apex received $50,000 from Holjeron and paid those funds to ABCO; and whether Defendants committed fraud, were self-dealing, breached their fiduciary duties, abused their control of Apex, grossly mismanaged Apex, wasted the corporate assets of Apex, violated Delaware corporate law, illegally converted the assets of Apex, and/or misrepresented ABCO's experience and skill to carry out the Services Agreement.

On July 10, 2007, Porteon's CEO Ken Montler and CFO James Boehlke met with Barry Dickman, Quantum's owner and manager, to discuss the possibility of Porteon purchasing Quantum's shares of Apex.  After the meeting, Dickman sent Boehlke an email in which he rejected Porteon's suggestion, noted the settlement offer in the Multnomah County action before Quantum voluntarily dismissed that case, advised he anticipated extensive legal fees if Quantum

11 - OPINION AND ORDER

were to renew its action against Defendants, predicted discovery
in such an action to be "monumental," and stated he did not "see
how Apex survives past about October" due to the costs of such an
action and the fact that no one would invest in Apex under a
cloud of litigation.

On September 6, 2007, the BOD formed a Special Investigative
Committee (SIC) to investigate Quantum's June 5, 2007, Demand for
Investigation.

On January 15, 2008, Hippert issued a report to Apex's
shareholders regarding Quantum's June 2007 Demand.  Hippert noted
Apex's SIC hired independent outside counsel, Peter Glade, to
investigate Quantum's Demand for Investigation and noted the SIC
concluded pursuant to the investigation that "Quantum's claims
have a tenuous foundation based on the facts."  Hippert conceded
Apex's BOD "could have kept better records of its deliberations"
and "may have stretched the boundaries of its authority in some
of its decisions."  Hippert concluded, however, even though the
BOD "may have made decisions that affected its own interests, the
ultimate outcome of its management of [Apex] during the time in
question was fair to [Apex]."  Finally, Hippert noted "the
diversion of resources to pursue litigation rather than advancing
the core business of Apex would surely cripple [Apex] and inhibit
the progress we are making."  Hippert concluded, therefore, Apex
would not take further action on Quantum's Demand for Investi-

12 - OPINION AND ORDER

gation.

On January 23, 2008, Dickman emailed Glade to express his dissatisfaction with the investigation and to question Glade's objectivity.  Glade forwarded Dickman's email to Hippert, expressed his discomfort with responding directly to Dickman, and reiterated the "scope and design" of the investigation "were free from outside influence."  Specifically, "Browning, Altman and Baker played no role in limiting or expanding the investigation, and neither did anyone else."

On March 25, 2008, Quantum filed a Complaint in this Court against Defendants in which it brought derivative claims for (1) breach of fiduciary duty; (2) abuse of control; (3) gross mismanagement; (4) waste of corporate assets; (5) specific performance; and (6) unjust enrichment and direct claims for (a) conspiracy to violate the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961, *et seq.*; (b) violation of RICO, 18 U.S.C. § 1962(a), (b), and (c); and (c) fraudulent inducement.

On May 8, 2008, Quantum filed its First Amended Complaint to include more factual allegations to support its RICO claims.

On May 9, 2008, Defendants filed Motions to Dismiss Quantum's First Amended Complaint.  After initial briefing, the Court permitted the parties to file supplemental briefs by September 26, 2008, to ensure the parties had an adequate

opportunity to make their record as to the issues raised in Defendants' Motions.  On September 26, 2008, Plaintiff filed a supplemental brief in opposition to Defendants' Motions. Defendants declined to file supplemental materials.

On October 3, 2008, the Court issued an Opinion and Order in which it granted Defendants' Motions to Dismiss and granted Quantum leave to amend its First Amended Complaint to cure the deficiencies set out in the Opinion and Order as to Quantum's derivative and fraudulent-inducement claims.  The Court declined to allow Quantum to amend its First Amended Complaint as to its RICO claims.

On November 1, 2008, Quantum filed a Second Amended Complaint in which it asserts derivative claims against Defendants for (1) breach of fiduciary duty, (2) abuse of control, (3) gross mismanagement, (4) waste of corporate assets, (5) specific performance, and (6) unjust enrichment and a direct claim for fraudulent inducement.

On December 30, 2008, Apex filed a Motion to Dismiss the derivative claims in the Second Amended Complaint.  On that same day, the remaining Defendants filed Motions to Dismiss or in the Alternative for Summary Judgment as to all of Quantum's claims.

On January 15, 2009, Quantum filed a Motion for Leave to File a Third Amended Complaint to add a claim for breach of contract.

On May 7, 2009, the Court held oral argument on the parties' Motions and took them under advisement.

### NOMINAL DEFENDANT APEX'S MOTION TO DISMISS DERIVATIVE CLAIMS IN SECOND AMENDED COMPLAINT (#37)[1]

Apex moves to dismiss Quantum's shareholder-derivative claims (breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, specific performance, and unjust enrichment) on the grounds that (1) Quantum does not fairly and adequately represent the interests of Apex's other similarly situated shareholders and (2) Quantum fails to plead with particularity as required under Rule 23.1 that its Demand for Investigation was wrongfully refused by the Apex BOD.

**I.   Quantum has not established it fairly and adequately represents the interests of Apex's other similarly situated shareholders.**

Apex contends Quantum does not fairly and adequately represent the interests of Apex's other similarly situated stockholders because (1) Quantum's conduct has been vindictive toward other Apex shareholders; (2) Quantum seeks to rescind its acceptance of Apex's shares, which conflicts with its interests as a shareholder; and (3) Quantum's interest in its direct claims far exceed and conflict with its interest in its derivative claims.

---

[1] All Defendants join in Apex's Motion to Dismiss.

### A.    Standards

Derivative actions are brought by a shareholder to enforce a corporation's rights when the corporation itself fails to enforce its rights.  *See Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 528-34 (1984).  As noted, derivative actions are subject to the procedural requirements of Rule 23.1, which provides a derivative action "may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association maintained."

As noted, to determine whether Quantum's Second Amended Complaint meets the pleading standards of Rule 23.1, the Court must look to the law of the state of the company's incorporation.  *Silicon Graphics*, 183 F.3d at 989-90.  Apex is incorporated in Delaware, and, therefore, the Court applies Delaware law.

Under Delaware law, "Rule 23.1 has been interpreted as requiring that a court consider any extrinsic factors which might indicate that a representative might disregard the interests of the other members of the class."  *Emerald Partners v. Berlin*, 564 A.2d 670, 673 (Del. Ch. 1989)(citing *Davis v. Comed., Inc.*, 619 F.2d 588 (6th Cir. 1980), and *Blum v. Morgan Guar. Trust Co. of New York*, 539 F.2d 1388 (5th Cir. 1976)).  For purposes of Apex's

16 - OPINION AND ORDER

Motion to Dismiss for Quantum's inadequacy as a shareholder representative, the Court, therefore, may consider matters outside of the complaint.

> "Among the elements which the courts have evaluated in considering whether the derivative plaintiff meets Rule 23.1's representation requirements are, economic antagonisms between representative and class; the remedy sought by the plaintiff in the derivative action; indications that the named plaintiff was not the driving force behind the litigation; plaintiff's unfamiliarity with the litigation; other litigation pending between the plaintiff and defendants; the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself; plaintiff's vindictiveness toward the defendants and, finally, the degree of support plaintiff was receiving from the shareholders he purported to represent."

> * * *

> "Typically, the elements are intertwined or interrelated, and it is frequently a combination of factors which leads a court to conclude that the plaintiff does not fulfill the requirements of 23.1 (although often a strong showing of one way in which the plaintiff's interests are actually inimical to those he is supposed to represent fairly and adequately, will suffice in reaching such a conclusion)."

*Id.* (quoting *Davis*, 619 F.2d at 593-95). "The determination of whether a derivative plaintiff will adequately represent the interests of the other class members, therefore, involves a multidimensional examination, although a strong showing of one factor, depending upon the circumstances, may be sufficient in itself to disqualify a plaintiff who desires to represent a class." *Id.* at 673-74.

17 - OPINION AND ORDER

A shareholder may maintain a derivative action even though "it does not have the support of a majority of the corporation's shareholders or even the support of all the minority stockholders." *Id*. at 674 (citing *Nolen v. Shaw-Walker Co.*, 449 F.2d 506, 508, n.4 (6th Cir. 1971)).  "The true measure of adequacy of representation, therefore, is not how many shareholders the derivative plaintiff represents, but rather, how well he advances the interests of the other similarly situated shareholders." *Id*. (citing *Schupack v. Covelli*, 512 F. Supp. 1310 (W.D. Pa. 1981), and *Halstead Video, Inc. v. Guttillo*, 115 F.R.D. 177 (N.D. Ill. 1987)).

Courts will not disqualify a plaintiff in a derivative action merely "because he may have interests which go beyond the interests of the class and, as long as the plaintiff's interests are coextensive with the class, his representation of the class will not be proscribed." *Id*. (citing *Recchion, Westinghouse Elec. Corp. v. Kirby*, 637 F. Supp. 1309 (W.D. Pa. 1986)).  In addition, "purely hypothetical, potential or remote conflicts of interest will not disqualify a derivative plaintiff." *Id*. (citing *Youngman v. Tahmoush*, 457 A.2d 376 (Del. Ch. 1983), and *Vanderbilt v. Geo-Energy Ltd.*, 725 F.2d 204 (3d Cir. 1983)).

> A defendant has the burden of proof in a motion to disqualify a derivative plaintiff and he must show that a serious conflict exists, by virtue of one factor or a combination of factors, and that the plaintiff cannot be expected to act in the interests of the others because doing so would

> harm his other interests. . . .   In effect, the
> defendant must show a substantial likelihood that
> the derivative action is not being maintained for
> the benefit of the shareholders.

*Id.*

### B.    Analysis

In its October 3, 2008, Opinion and Order, the Court

found

> Apex points to the fact that Quantum threatened on
> July 10, 2007, to litigate the matters at issue
> here, to subject Apex through litigation to the
> high cost of "monumental" discovery, and to place
> Apex "under a cloud of litigation" that would
> cause investors not to invest in Apex to the
> extent that Quantum acknowledged it did not "see
> how Apex survive[d] past October."  These facts
> establish Quantum had more than "amorphous hostile
> feelings" against Apex's other shareholders and
> reveal a concrete conflict of interest between
> Quantum and Defendants.  In addition, the record
> does not reflect any other Apex shareholder
> supports Quantum's efforts to rescind Apex's stock
> transfer or to obtain any of the other relief
> sought by Quantum.

The Court, therefore, granted Apex's Motion to Dismiss on the

ground that Apex was not an adequate class representative.

In its Response to Apex's Motion to Dismiss Quantum's

derivative claims, Quantum asserts the statement by Dickman in

the July 10, 2007, email that Quantum "will settle in full and

release all parties via a sale of its entire Apex holding for

$750,000" was merely a response to Porteon's settlement offer.

Quantum also contends the July 10, 2007, email does not

demonstrate a conflict of interest between Quantum and the other

19 – OPINION AND ORDER

shareholders because "Quantum's settlement offer was directed to Porteon, not any defendant shareholder of Apex, or even Apex itself."  Quantum also notes it added allegations in the Second Amended Complaint that other shareholders support Quantum's efforts to rescind Apex's stock transfer as follows:

> Mr. Bales, a major shareholder and one of the shareholders who voted with Plaintiff during the February, 2006 board meeting, supports Plaintiff's derivative action, and believes that ABCO did not meet the milestones of the services agreement and that shares distributed with respect to the services agreement properly should be returned to Apex for the nominal amount stated in the services agreement.  Another shareholder would support Plaintiff's derivative action, but has refused actively to do so because of fear of retaliation.

Second Am. Compl. ¶ 43.

Even though Porteon is not a defendant shareholder in this action, Porteon was the largest shareholder of Apex in July 2007, and, therefore, Quantum's assertion that making statements to Porteon does not reflect a conflict of interest is not dispositive.  In addition, Quantum's statements that it anticipated the cost of its litigation with Apex and other shareholders would be "monumental" and would place Apex "under a cloud of litigation" that would cause investors not to invest in Apex to such a degree that Quantum did not "see how Apex survive[d] past October" are more than mere "posturing" for the purpose of settlement negotiations.  These statements demonstrate a concrete conflict between Quantum's litigation and the

interests of Apex and its other shareholders that goes beyond "amorphous hostile feelings." The fact that Quantum made those statements to Porteon suggests Quantum is an inadequate shareholder representative because Porteon is part of the shareholder group that Quantum seeks to represent in this action.

In addition, even though Quantum seeks "direct damages" in its Second Amended Complaint "including a return of Quantum's initial investment in Primotive," Quantum asserts in its Response to Apex's Motion that it actually seeks an order directing Apex to "repurchase the Individual Defendants' shares at a nominal price." It is unclear how forcing Apex to use available capital to repurchase shares at some undefined "nominal price" would benefit Apex.

As noted, "[t]he true measure of adequacy of representation . . . is not how many shareholders the derivative plaintiff represents, but rather, how well he advances the interests of the other similarly situated shareholders [and] . . . a strong showing of one factor, depending upon the circumstances, may be sufficient in itself to disqualify a plaintiff who desires to represent a class." *Emerald Partners*, 564 A.2d at 673-74 (citations omitted). Here even though Quantum alleges two other Apex shareholders support the derivative action, Apex has established Quantum has a concrete conflict of interest that renders it an inadequate representative for Apex's

21 - OPINION AND ORDER

shareholders.

## II. Quantum has not adequately pled wrongful demand refusal under Rule 23.1

Even if Quantum establishes it is an adequate shareholder representative, Apex asserts Quantum has not adequately pled wrongful demand refusal as required under Rule 23.1.

### A. Standards

Rule 23.1 requires a complaint in a shareholder-derivative action to

> (3) state with particularity:
>
> > (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and
> >
> > (B) the reasons for not obtaining the action or not making the effort.

The demand requirement of Rule 23.1 is based on the basic premise that "directors, rather than shareholders, manage the business and affairs of the corporation." *Spiegel v. Buntrock*, 571 A.2d 767, 772-73 (Del. Supr. 1990). "The decision to bring a law suit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation. Consequently, such decisions are part of the responsibility of the board of directors." *Id.* at 773 (citation omitted). Derivative actions are "[i]n essence, . . . a challenge to a board of directors' managerial power." *Id.* (citation omitted).

Thus, by its very nature, "the derivative action

22 - OPINION AND ORDER

impinges on the managerial freedom of directors."
*Pogostin v. Rice*, 480 A.2d 619, 624 (Del. Supr.
1984).  In fact, the United States Supreme Court
has noted that the shareholder derivative action
"could, if unrestrained, undermine the basic
principle of corporate governance that the
decisions of a corporation- including the decision
to initiate litigation-should be made by the board
of directors or the majority of shareholders."
*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 531
(1984)(citing *Hawes v. Oakland,* 104 U.S. 450
(1882)).  *See Kaplan v. Peat, Marwick, Mitchell &
Co.*, 540 A.2d 726, 730 (Del Supr. 1988).

"Because the shareholders' ability to
institute an action on behalf of the corporation
inherently impinges upon the directors' power to
manage the affairs of the corporation the law
imposes certain prerequisites on a stockholder's
right to sue derivatively." *Kaplan v. Peat,
Marwick, Mitchell & Co.*, 540 A.2d at 730 (citing
*Pogostin v. Rice*, 480 A.2d at 624); *Aronson v.
Lewis*, 473 A.2d at 811. . . . Rule 23.1 requires
that shareholders seeking to assert a claim on
behalf of the corporation must first exhaust
intracorporate remedies by making a demand on the
directors to obtain the action desired, or to
plead with particularity why demand is excused.
*Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d
at 730.  *See also Aronson v. Lewis*, 473 A.2d at
811-812; *Zapata Corp. v. Maldonado*, 430 A.2d at
783.

The purpose of pre-suit demand is to assure
that the stockholder affords the corporation the
opportunity to address an alleged wrong without
litigation, to decide whether to invest the
resources of the corporation in litigation, and to
control any litigation which does occur. *Kaplan
v. Peat, Marwick, Mitchell & Co.*, 540 A.2d at 730.
"[B]y promoting this form of alternate dispute
resolution, rather than immediate recourse to
litigation, the demand requirement is a
recognition of the fundamental precept that
directors manage the business and affairs of
corporations." *Aronson v. Lewis*, 473 A.2d at 812.

*Id*.

23 - OPINION AND ORDER

As to the level of particularity required for a Demand
under Rule 23.1, the Court, as noted, must apply Delaware law to
the derivative claims in this case.  *See Silicon Graphics*, 183
F.3d at 989-90.  Under Delaware law, when a court analyzes
whether a Demand complies with the requirements of Rule 23.1, the

> court limits its consideration to the
> particularized facts alleged in the complaint; the
> burden is thus more onerous than that required to
> withstand an ordinary motion to dismiss. . . .
> "Conclusory allegations of fact or law [which are]
> not supported by allegations of specific fact may
> not be taken as true."

*Belova v. Sharp*, No. CV 07-299-MO, 2008 WL 700961, at *3 (D. Or.
March 13, 2008)(citing *Aronson v. Lewis*, 473 A.2d 805, 813-15
(Del. 1984)), *overruled on other grounds by Brehm v. Eisner*, 796
A.2d 244 (Del. 2000), and quoting *Levine v. Smith*, 591 A.2d 194,
207 (Del. 1991)).

**B.  Analysis**

In its First Amended Complaint, Quantum alleged it did
not make a Demand because it would have been futile or, in the
alternative, that Quantum made a Demand, but Apex's investigation
was inadequate.  In its October 3, 2008, Opinion and Order, the
Court concluded Quantum's allegation of futility was insuffi-
cient.  The Court also concluded:

> Quantum does not specifically allege in its First
> Amended Complaint that its demand was wrongfully
> refused.  Instead Quantum alleges the
> investigation was inadequate, the BOD is "not
> disinterested," the BOD's decisions are not the
> products of valid business judgment, and the

transactions were not fair and reasonable for the
company.  The Court concludes these allegations
are merely generalized conclusory statements and
do not satisfy the specificity requirements of
Rule 23.1.

In its Second Amended Complaint, Quantum omitted the

allegation that it did not make a demand on Apex and instead

alleges Quantum demanded the BOD "take the actions demanded in

this Complaint" on June 5, 2007.  Quantum also adds the following

allegations in an effort to allege the manner in which Apex's

investigation was inadequate and to meet the requirements of Rule

23.1:

Among other things, the investigator failed even
to interview two shareholders/consultants,
Mr. Bales and Mr. Ritz, each of whom voted during
the February shareholders meeting to repurchase
the shares related to the services agreement, and
each of whom, by virtue of their expertise and
work for Apex as consultants, would have relevant
knowledge regarding all the breaches of fiduciary
duty alleged herein, as well as would have
relevant knowledge about the non-performance by
ABCO of the services agreement. In deciding not to
act, or purportedly deciding not to act, Apex's
board did not give any consideration to the
inadequacy of the investigation.  Accordingly, any
determination that the Plaintiff's allegations are
not soundly based in fact and that the
transactions were fair to Apex are without
reasonable basis.  Refusing Plaintiff's demand
without a reasonable basis was a wrongful refusal
by the then-current board of directors.

Second Am. Compl. ¶ 42.  In addition, Quantum asserts in its

Response to Apex's Motion that Bales and Ritz are the only "non-

interested" sources of material information and that "apparently

the SIC and [BOD] relied on material misinformation from

25 - OPINION AND ORDER

interested potential defendants of their derivative action."

Under Delaware law, the Court must examine Apex's decision to refuse Quantum's Demand under the business-judgment rule, which establishes a presumption that the BOD acted in good faith and with the honest belief that refusal was in the best interests of the company. *Halpert Enter., Inc. v. Harrison*, No. 07-1144-cv, 2008 WL 4585466, at *1 (2d Cir. Oct. 15, 2008) (applying Delaware law). To overcome the presumption of the business-judgment rule in the context of a pre-litigation demand,

> a plaintiff must allege facts that, if true, raise a "reasonable doubt" as to whether the board members performed their duty of due care by informing themselves of all material information reasonably available to them. The issues to be examined are solely the good faith and reasonableness of [the board's] investigation. The board's ultimate conclusion . . . is not subject to judicial review. The standard by which the directors' actions in conducting an investigation and seeking to inform themselves adequately are to be judged is gross negligence.

*Id*. (quotations and citations omitted).

As noted, Quantum alleges in its Second Amended Complaint that the investigation conducted by the SIC on behalf of Apex's BOD was inadequate because the investigator failed to interview Bales and Ritz who would have unspecified "relevant knowledge regarding all the breaches of fiduciary duty alleged herein" and about "the non-performance by ABCO of the services agreement."

Under Delaware law, however, "[a]n investigating board

26 - OPINION AND ORDER

generally is under no obligation to make use of any particular
investigative technique," *id.*, at *2, and "the choice of people
to interview or documents to review is one on which reasonable
minds may differ . . . . [I]nevitably there will be potential
witnesses, documents, and other leads that the investigator will
decide not to pursue." *Mount Moriah Cemetery v. Moritz*, Civ. No.
11431, 1991 WL 50149, at *4 (Del. Ch. Apr. 4, 1991).  Thus,
"there is no rule of general application that a board must
interview every possible witness who may shed some light on the
conduct forming the basis of the litigation." *Halpert*, 2008 WL
4585466, at *2.  In fact, there is not any rule that requires a
board to interview anyone.  *See, e.g., Levine v. Smith,* 591 A.2d
194, 214 (1991)(court held the board did not wrongfully refuse
the plaintiff's demand when the board merely reviewed and
rejected the demand letter without forming a committee or
retaining outside counsel).

        In *Halpert*, the plaintiff alleged the independent
committee's investigation was inadequate because the committee
failed to interview any of the 24 individual defendants named in
the complaint.  2008 WL 4585466, at *3.  The Second Circuit
rejected the plaintiff's assertion noting:

                In this case, . . . there is little to suggest
                that interviewing the defendants would have
                uncovered any new, material facts that could have
                altered the Audit Committee's recommendation.
                [The plaintiff] fails to allege, for example, why
                the information provided by attorneys who had

27 - OPINION AND ORDER

> worked extensively on prior investigations and
> litigation was insufficient to give the board a
> sense of what had happened at JPMorgan in
> connection with the alleged wrongdoing or why
> interviews of the named defendants would provide
> any unique information.
>
> This is not to say that interviews with the named
> defendants necessarily would have uncovered no new
> material information.  Rather, we merely find that
> [the plaintiff] has not met the heavy burden
> imposed upon it. Under the circumstances of this
> case, the District Court did not abuse its
> discretion in concluding that [the plaintiff's]
> allegations with regard to the Audit Committee's
> investigatory measures did not raise a reasonable
> doubt as to whether the board satisfied its duty
> of due care by availing itself of all reasonably
> available material information.

*Id*.  Here, as noted, Apex's SIC hired independent outside counsel

to investigate Quantum's Demand.  Glade was given authority to

"conduct the research or analysis he believed necessary to come

to a sound, well-reasoned opinion."  Glade interviewed several

witnesses including Barry Dickman.

Quantum does not allege with any degree of

particularity the "relevant knowledge" that Bale and Ritz

possess; how that knowledge is unique and, therefore,

unobtainable through other witnesses; or how the allegedly

relevant knowledge would have altered the BOD's decision to

refuse Quantum's demand in light of the factors identified by the

SIC (*i.e.,* concern that "division of resources" to pursue

litigation would "surely cripple [Apex]" and that Quantum's

claims had "a tenuous foundation based on the facts.").  In

28 - OPINION AND ORDER

addition, as noted, Apex's SIC was not required to interview Bales, Ritz, or any shareholder under Delaware law for its investigation to be sufficient.  The Court, therefore, concludes Quantum has failed to adequately plead wrongful demand refusal under Rule 23.1

In summary, the Court concludes on this record that Quantum has not established it is an adequate shareholder representative and, in any event, Quantum has not adequately pled wrongful demand refusal.  Accordingly, the Court grants Apex's Motion to Dismiss Quantum's derivative claims.

**III. Quantum has had sufficient chances to amend its Complaint.**

It is within the Court's discretion to dismiss claims with prejudice and without leave to amend when a plaintiff has previously been given the chance to amend to cure.  *See Chodos v. West Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002)(citation omitted).

Apex asserts Quantum should not be given leave to amend its Second Amended Complaint to cure the deficiencies of its derivative claims.  The Court agrees.  Quantum has filed three Complaints in this Court and one complaint in state court, but it has failed to adequately plead its suitability to act as a shareholder representative or that Apex's investigation was inadequate.

Accordingly, the Court dismisses Quantum's shareholder-

derivative claims with prejudice and without leave to amend.

## MOTIONS TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT OF BAKER DEFENDANTS (#39) AND ALTMAN DEFENDANTS (#44)

Baker Defendants and Altman Defendants move to dismiss Quantum's fraudulent-inducement claim pursuant to Federal Rules of Civil Procedure 12(b)(6), 9(b), and 23.1 on the grounds that Quantum did not plead that claim with sufficient particularity and, in any event, that claim is barred by the statute of limitations. In the alternative, Defendants move for summary judgment on this claim on the ground that it is barred by the statute of limitations.[2] The Baker and Altman Defendants also join Apex's Motion to Dismiss Quantum's shareholder-derivative claims.

## I.    Quantum's shareholder-derivative claims.

The Court grants the Baker and Altman Defendants' Motions to Dismiss Quantum's shareholder-derivative claims for the same reasons set out by the Court as to Apex's Motion to Dismiss these claims.

## II.   Quantum has not pled its fraudulent-inducement claim with sufficient particularity.

As noted, Federal Rule of Civil Procedure 9(b) requires all

---

[2] Because the Court concludes Quantum did not plead its fraudulent-inducement claim with sufficient particularity, the Court does not address the statute-of-limitations issue.

allegations of fraud to be stated "with particularity."  To
satisfy the additional burdens imposed by Rule 9(b), the
plaintiff must allege "the time, place and nature of the alleged
fraudulent activities." *Fecht*, 70 F.3d at 1082 (quotation
omitted).  In addition, Rule 9(b)

> does not allow a complaint to merely lump multiple
> defendants together but require[s] plaintiffs to
> differentiate their allegations when suing more
> than one defendant . . . and inform each defendant
> separately of the allegations surrounding his
> alleged participation in the fraud.

*Swartz*, 476 F.3d at 764-65 (quotation omitted).  "In the context
of a fraud suit involving multiple defendants, a plaintiff must,
at a minimum, 'identif[y] the role of [each] defendant[ ] in the
alleged fraudulent scheme.'"  *Id.* at 765 (quoting *Moore*, 885 F.2d
at 541).

     In its October 3, 2008, Opinion and Order, the Court
dismissed Quantum's fraudulent-inducement claim on the ground
that Quantum had not pled that claim with sufficient
particularity under Rule 9(b) because Quantum did not

> plead any facts to show Defendants knew the
> representation was false at the time it was made
> in contrast to the possibility that Defendants may
> have honestly misjudged ABCO's ability to perform
> or that some other circumstance prohibited
> performance.  *See Yourish v. Cal. Amplifier*, 191
> F.3d 983, 993 (9th Cir. 1999)(the plaintiff must
> "set forth, as part of the circumstances
> constituting fraud, an explanation as to why the
> disputed statement was untrue or misleading when
> made.  This falsity requirement can be satisfied
> by pointing to inconsistent contemporaneous
> statements or information (such as internal

reports) which were made by or available to the
defendants."  Quotations omitted.)).

Defendants contend the allegations Quantum added to its
Second Amended Complaint are not sufficiently particular because
Quantum does not plead facts sufficient to support its allegation
that Defendants "knew the allegations were false when made" as
opposed to mere errors in judgment by Defendants.  Defendants
rely on *Yourish* to support their assertion that Quantum must
allege sufficient facts to establish Defendants knew their
representations were false when they made them.

Quantum asserts a close reading of *Yourish* and *In re Glenfed
Securities Litigation,* the case on which *Yourish* relied,
establish Rule 9(b) does not require a plaintiff to plead
sufficient facts to show a representation was false when made.
According to Quantum, that requirement arises under Rule 23.1
and, therefore, does not apply to Quantum's fraudulent-
inducement claim because it brings that claim under Oregon common
law rather than the Private Securities Litigation Reform Act
(PSLRA), 15 U.S.C. § 78u, *et seq*.  Quantum asserts allegations of
failure to perform alone are sufficient under Oregon law to
survive a motion to dismiss.

**A.  Quantum's fraudulent-inducement claim is not preempted
     under the PSLRA.**

As noted, Quantum asserts it does not bring its
fraudulent-inducement claim for securities fraud under the PSLRA,

but rather as a common-law fraudulent-inducement claim.

According to Quantum, therefore, the requirement noted in *Yourish*

that a plaintiff must plead facts showing Defendants knew their

representations were false at the time they made them does not

apply.

Defendants, however, assert Quantum's claim is one for

securities fraud under the PSLRA rather than one for common-law

fraud.  Defendants rely on the Court's analysis in its October

2008 Opinion and Order related to Quantum's ability to bring a

RICO claim based on allegations in the First Amended Complaint.

The Court noted:

> When determining whether conduct alleged in the
> context of a RICO claim is "conduct . . .
> actionable as fraud in the purchase or sale of
> securities," courts have looked to the Securities
> Exchange Act of 1983, 15 U.S.C. § 78j(b), which
> makes it "unlawful for any person . . . [t]o use
> or employ, in connection with the purchase or sale
> of any security . . . any manipulative or
> deceptive device or contrivance in contravention
> of such rules and regulations as the [SEC] may
> prescribe."  Rule 10b-5 implements this provision
> and forbids the use "in connection with the
> purchase or sale of any security" of "any device,
> scheme, or artifice to defraud" or any other "act,
> practice, or course of business" that "operates
> . . . as a fraud or deceit."  17 C.F.R.
> § 240.10b-5.
>
> In *S.E.C. v. Zanford*, the Supreme Court
> explained these provisions "should be construed
> not technically and restrictively, but flexibly to
> effectuate [the Act's] remedial purposes."  535
> U.S. 813, 820 (2002).  In *Zanford*, the defendant,
> a securities broker, persuaded William Wood to
> open an investment account and to give the
> defendant a general power of attorney to engage in

securities transactions for Wood's benefit without
prior approval. *Id*. at 815. Several years later,
an audit revealed the defendant had transferred
money from Wood's account to accounts controlled
by the defendant on over 25 occasions. *Id*. The
defendant was indicted on 13 counts of wire fraud
based on allegations that the defendant sold
securities in Wood's account and made personal use
of the proceeds. *Id*. at 815-16. The Securities
and Exchange Commission (SEC) then brought a civil
complaint against the defendant in which it
alleged the defendant violated § 10(b) of the
Securities Exchange Act when he engaged in a
scheme to defraud Wood and misappropriated Wood's
securities. *Id*. at 816. The Supreme Court
accepted *certiorari* to determine whether the
defendant's alleged fraudulent conduct occurred
"in connection with the purchase or sale of any
security" within the meaning of § 10(b) and Rule
10b-5. The defendant asserted he had not
committed fraud "in connection with" the sale of
securities because the "sales themselves were
perfectly lawful" and were not "in connection
with" the misappropriation of the proceeds from
those sales. *Id* at 820. The Court rejected the
defendant's argument and reasoned:

[T]he securities sales and the respondent's
fraudulent practices were not independent events.
This is not a case in which, after a lawful
transaction had been consummated, a broker decided
to steal the proceeds and did so. Nor is it a
case in which a thief simply invested the proceeds
of a routine conversion in the stock market.
Rather, the respondent's fraud coincided with the
sales themselves. . . . [E]ach sale was made to
further respondent's fraudulent scheme. . . . In
the aggregate, the sales are properly viewed as a
course of business that operated as a fraud or
deceit on a stockbroker's customer.

*Id*. at 820-21. The Court noted the "in connection
with" requirement for securities fraud was
"extremely broad" and only proof of "a fraudulent
scheme in which the securities transactions and
breaches of fiduciary duty coincide" is necessary
to satisfy that requirement. *Id*. at 825.

The Court's analysis in its October 2008 Opinion and
Order as to Quantum's RICO claim, however, does not establish
Quantum's fraudulent-inducement claim is one for securities
fraud.  As noted, RICO contains a specific provision disallowing
a party from bringing claims under RICO that are actually
securities-fraud claims.  The PSLRA and securities laws, however,
do not preempt common-law actions for fraud.  *See In re Boeing
Sec. Litig.*, 40 F. Supp. 2d 1160, 1178-79 (W.D. Wash. 1998)
("Until Congress specifically preempts this field, there is no
basis for finding that plaintiffs' claims under the Washington
State Securities Act have been preempted by the PSLRA.").

Accordingly, the Court concludes Quantum's common-law
claim for fraudulent inducement is not preempted by the PSLRA,
and, therefore, the pleading requirements of Rule 23.1 do not
apply.

**B.   Pleading requirements in this case.**

As noted, the Ninth Circuit stated in *Yourish* that

> the plaintiff must set forth, as part of the
> circumstances constituting fraud, an explanation
> as to why the disputed statement was untrue or
> misleading when made.  This falsity requirement
> can be satisfied by pointing to inconsistent
> contemporaneous statements or information (such as
> internal reports) which were made by or available
> to the defendants.

191 F.3d at 993 (quotations omitted).  Although the Ninth Circuit
made that statement in the context of whether the complaint in
that case met the requirements of Rule 9(b) generally, *Yourish*

35 - OPINION AND ORDER

involved securities-fraud claims under the Securities and
Exchange Act rather than state-law claims.  In addition, the
Ninth Circuit cited to *In re GlenFed Securities Litigation,* which
also was a securities-litigation action.  The Ninth Circuit noted
in *Glen Fed*:

> What makes many securities fraud cases more
> complicated is that often there is no reason to
> assume that what is true at the moment plaintiff
> discovers it was also true at the moment of the
> alleged misrepresentation, and that therefore
> simply because the alleged misrepresentation
> conflicts with the current state of facts, the
> charged statement must have been false.
> Securities fraud cases often involve some more or
> less catastrophic event occurring between the time
> the complained-of statement was made and the time
> a more sobering truth is revealed (precipitating a
> drop in stock price).  Such events might include,
> for example, a general decline in the stock
> market, a decline in other markets affecting the
> company's product, a shift in consumer demand, the
> appearance of a new competitor, or a major
> lawsuit.  When such an event has occurred, it is
> clearly insufficient for plaintiffs to say that
> the later, sobering revelations make the earlier,
> cheerier statement a falsehood.  In the face of
> such intervening events, a plaintiff must set
> forth, as part of the circumstances constituting
> fraud, an explanation as to why the disputed
> statement was untrue or misleading when *made*.

42 F.3d 1548-49 (9th Cir. 1994)(emphasis in original).  Thus,
according to Quantum, the requirement under *GlenFed* that a
plaintiff must plead facts sufficient to show a statement was
untrue or misleading when it was made applies only to securities
litigation actions.

Moreover, Quantum asserts evidence of failure to

perform alone is not sufficient to prove fraud under Oregon law,
but it is sufficient to survive a motion to dismiss.  Quantum
cites *Communications Group v. GTW Mobilnet*, 127 Or. App. 121, 126
(1994), to support its assertion.

In *Communications*, the plaintiff brought an action
against the defendants for "deceit."  The plaintiff alleged the
defendants fraudulently represented to the plaintiff that they
intended to offer a reseller contract to the plaintiff.  The
defendants moved for a directed verdict at the close of the
plaintiff's case.  The court denied the defendants' motion.  The
defendants then moved for judgment notwithstanding the verdict,
and the trial court granted the motion.  The plaintiff appealed.
The Oregon Court of Appeals affirmed, noting:

> To recover for deceit, plaintiffs have the burden
> of proving that:  (1) defendants made a false
> representation; (2) they made it with the
> knowledge or belief that it was false, or with an
> insufficient basis for asserting that it was true;
> (3) they made the representation with the intent
> that plaintiffs would rely on it; (4) plaintiffs
> justifiably relied on it; and (5) they suffered
> consequent damages. . . .  The proof of each
> element must be clear and convincing. 303 Or. at
> 407.
>
> Because the alleged misrepresentations are
> promises to do something in the future, plaintiffs
> must prove that defendants either intended not to
> perform when they made the promises, or that they
> made the promise with reckless disregard for
> whether they could perform.
>
> A fraudulent intent not to perform may not be
> inferred from the mere fact of the eventual
> failure to perform.  Other circumstances of a

> substantial character must be shown in addition to
> nonperformance, to support the inference that the
> promissor never intended to perform.  In this
> case, therefore, plaintiffs must show that there
> is evidence in the record, beyond the mere fact of
> nonperformance, from which a reasonable juror
> could find that, at the time defendants made their
> representations, they did not intend to honor
> them.

*Id.* at 125-26.  The court also noted "[t]he evidence that plaintiffs rely on to show that defendants' representations were fraudulent is the same evidence that they rely on to show the existence of those representations." *Id.* at 126-27.

Because there is not any indication in *Communications* that the defendants filed a motion to dismiss or attempted to have the plaintiffs' deceit claim dismissed before trial, this case does not support Quantum's assertion that evidence of failure to perform alone is sufficient to survive a motion to dismiss under Oregon law.

In addition, *Communications* establishes the same standard for pleading and proving a common-law fraudulent-inducement claim under Oregon law as that announced in *Yourish*; *i.e.*, a plaintiff pleading common-law fraudulent inducement must plead and prove the defendant made the allegedly false statement knowing it was false or was reckless as to its truth at the time it made the statement, and when the alleged misrepresentation is a promise to do something in the future, a plaintiff must plead and prove the defendant either intended not to perform when it

made the promises or that it made the promise with reckless disregard for whether it could perform.

Accordingly, whether Quantum intended to bring a claim for fraudulent inducement under Oregon common law or under federal securities law, Quantum must, pursuant to *Yourish* and *Communications,* plead with sufficient specificity that Defendants made the allegedly false statements either knowing they were false at the time or with reckless disregard for their truth at the time.  In addition, the fact that Defendants ultimately did not perform the contract is not sufficient to plead or to prove fraudulent inducement under either *Yourish* or *Communications.*

**C.    Quantum has not pled fraudulent inducement with sufficient specificity.**

In its Second Amended Complaint, Quantum alleges the following facts in support of its fraudulent-inducement claim:

> On behalf of ABCO, and for their own benefit and account, the Individual Defendants made the misrepresentations identified in paragraph 16, above, which is incorporated herein by reference. The Individual Defendants knew the allegations were false when made, as demonstrated by the facts that:  (1) ABCO either lacked or intentionally refused to dedicate financial resources sufficient to develop a commercially viable product out of the Primotive motor between the closing of the transaction and the end of the services agreement; and (2) ABCO demonstrated between the closing of the transaction and the end of the services agreement that it lacked the engineering experience to develop a commercially viable product out of the Primotive motor.

Second Am. Compl. ¶ 45.  In ¶ 16 of the Second Amended Complaint,

39 – OPINION AND ORDER

Quantum makes the following new allegations:

ABCO and the Individual Defendants also
represented to Plaintiff that David Browing had
the ability to perform the product engineering
necessary to make a viable commercial product out
of the Primotive motor, including the development
of a motor controller.  ABCO and the Individual
Defendants also represented to Plaintiffs that it
had adequate financial resources to develop the
Primotive motor, which would be allocated to that
purpose.  Specifically, ABCO and the Individual
Defendants made representations as follows, at the
following specified times and places:

a.    During a lunch meeting at about 1PM on
July 22, 2003, David Browing and Michael
Baker met with Plaintiff's Barry
Dickman.  During that meeting both Baker
and Browing represented that ABCO had
the ability to perform the engineering,
marketing and other work required to
make a commercially viable product from
Primitive's motor.  They also
represented that ABCO was a successful
company with sufficient cash flow such
that it could finance the development of
a commercially viable product from
Primotive's motor, while some additional
financing would be required to "scale"
the new company into a full-fledged,
stand alone business;

b.    In a telephone conversation on or about
October 3, 2003 between Mr. Dickman and
Baker, Mr. Baker represented that ABCO
had the financial ability to perform the
product  development; and

c.    In a meeting at ABCO's offices in or
about September 2003, Mr. Dickman met
with Mr. Baker, Mr. Browning, and
Ms. Altman.  Browning and Baker
confirmed the technical ability of the
company as well as the financial ability
to perform the engineering required to
make a commercially viable product

> during this meeting.  Ms. Altman,
> through body language, including nodding
> her head, confirmed Browning and Baker's
> representations.

Second Am. Compl. ¶ 16.

Like the plaintiffs in *Communications*, Quantum alleges in ¶ 16 of the Second Amended Complaint that Defendants made false representations rather than alleging that Defendants knew their representations were false at the time they were made. Quantum has not alleged anything other than Defendants' failure to perform to support its assertion that Defendants knew or recklessly disregarded the fact that they could not perform the contract when they executed it.  The Court, therefore, concludes Quantum has not pled fraudulent inducement with the level of specificity required under Rule 9(b), Ninth Circuit securities law, or Oregon common law.

Accordingly, the Court grants Defendants' Motions to Dismiss Quantum's fraudulent-inducement claim.

## III. Quantum has had sufficient chances to amend its fraudulent-inducement claim.

As noted, it is within the Court's discretion to dismiss claims with prejudice and without leave to amend when a plaintiff has previously been given the chance to cure any deficiencies. *See Chodos*, 292 F.3d at 1003.

Defendants assert Quantum should not be given leave to amend its Second Amended Complaint to cure the deficiencies as to its

41 - OPINION AND ORDER

fraudulent-inducement claim.  The Court agrees.  As noted, Quantum has had numerous opportunities in this Court and in state court to plead fraudulent inducement with sufficient particularity.

Accordingly, the Court dismisses Quantum's fraudulent-inducement claim with prejudice and without leave to amend.

## QUANTUM'S MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT (#58)

### Standards

Federal Rule of Civil Procedure 15(a) provides a party may amend a pleading after a responsive pleading has been filed only by leave of court unless the opposing party consents to the amendment.  Rule 15(a), however, also provides that leave to amend "shall be freely given when justice so requires."  "This policy is to be applied with extreme liberality."  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).

The Supreme Court has recognized several factors that a district court should consider when determining whether justice requires the court to grant leave to amend.  Those factors include

> undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the

42 - OPINION AND ORDER

amendment, futility of the amendment.
*Id*. at 1052 (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).
The factor that carries the greatest weight is whether the
amendment will cause the opposing party prejudice.  *Id*.  "Absent
prejudice or a strong showing of any of the remaining *Foman*
factors, there exists a presumption under Rule 15(a) in favor of
granting leave to amend."  *Id.*  "Delay alone, no matter how
lengthy is an insufficient ground for denial of leave to amend."
*United States v. Webb,* 655 F.2d 977, 980 (9th Cir. 1981).

These principles apply whether the party seeking leave to
amend is the plaintiff or the defendant.  *See, e.g., Komie v.
Buehler Corp*., 449 F.2d 644 (9th Cir. 1971); *United States v.
Webb,* 655 F.2d at 980.

## Discussion

Quantum seeks leave to file a Third Amended Complaint to add
a claim for breach of contract against the individual Defendants.
Specifically, Quantum seeks to add the following paragraphs:

> Individual Defendants breached their
> contractual obligations to Plaintiff under Article
> 3.12 of the Apex Bylaws by voting in favor of and
> ratifying approval of a transaction in which
> Individual Defendants had an interest.

> As a direct and proximate result of the
> Individual Defendants' breaches of their
> contractual obligations under the Apex Bylaws,
> Plaintiff has sustained significant damages as
> alleged herein.

Baker and Altman Defendants oppose Quantum's Motion on the

grounds that (1) a breach-of-contract cause of action does not exist between shareholders for breach of a company's bylaws; (2) Delaware law provides other remedies to contest a BOD or shareholder vote; (3) even if a breach-of-contract cause of action exists, it is a derivative rather than direct claim; (4) Quantum's request is too late; and (5) Quantum's Motion is made in bad faith and with a dilatory motive.

The Court cannot fairly decide the issues raised by Defendants as to the proposed Third Amended Complaint as it has been submitted. The Court, therefore, denies Quantum's Motion for Leave to File Third Amended Complaint as to the form of the Third Amended Complaint that Quantum submitted with its Motion. The Court, however, grants Quantum leave to file by June 29, 2009, a Third Amended Complaint limited to a putative claim for breach of contract as set out by Quantum in its Motion. The Court grants Defendants leave to file any Motions to Dismiss as to Quantum's Third Amended Complaint by July 22, 2009.

## CONCLUSION

For these reasons, the Court **GRANTS** the Motion (#37) to Dismiss filed by Nominal Defendant Apex Drive Laboratories, Inc.; **GRANTS** the Motion (#39) to Dismiss or in the Alternative for Summary Judgment filed by Defendants Baker Group LLP and Michael J. Baker; **GRANTS** the Motion (#44) to Dismiss or in the

44 - OPINION AND ORDER

Alternative for Summary Judgment filed by Defendants Altman Browning and Company, Kay E. Altman, and David M. Browning; and **DENIES** the Motion (#58) for Leave to File (Third) Amended Complaint filed by Plaintiff Quantum Technology Partners II, L.P. The Court **DENIES in part** and **GRANTS in part** Quantum's Motion to File (Third) Amended Complaint to the extent that Quantum has leave to file no later than **July 7, 2009,** a Third Amended Complaint limited to a putative claim for breach of contract as set out by Quantum in its Motion for Leave to File Third Amended Complaint.  The Court also **GRANTS** Defendants leave to file any Motions to Dismiss as to Quantum's Third Amended Complaint by **July 28, 2009.**

IT IS SO ORDERED.

DATED this 23rd day of June, 2009.


/s/ Anna J. Brown

_____

ANNA J. BROWN
United States District Judge


45 - OPINION AND ORDER